**LANDY v. UNITED STATES et al.**

No. 155 of 1947.

United States District Court
E. D. Pennsylvania.

Dec. 11, 1951.

Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., Krusen, Evans & Shaw, Philadelphia, Pa., for the United States.

KALODNER, Circuit Judge.

This libel in personam was brought against the United States pursuant to the Suits in Admiralty Act, 46 U.S.C.A. § 742. Libelant is the administrator of the estate of a deceased seaman. He is seeking to assert a cause of action under the Jones Act, 46 U.S.C.A. § 688,[1] alleging that his decedent's death was caused by respondent's negligence in: (1) failing to provide a safe means of ingress to the vessel; and (2) failing to provide the decedent with prompt and adequate medical care and attention.

The cause having been submitted to the court on the basis of the pleadings, depositions, additional testimony and exhibits, I make the following

### Findings of Fact

1. Libellant, Samuel H. Landy, was appointed administrator of the estate of Alvin R. Vervaecke, deceased, on October 3, 1946, by the Register of Wills of Philadelphia County, Pennsylvania.

2. At all times material hereto the decedent, Alvin R. Vervaecke, was employed in the capacity of able-bodied seaman on board the S. S. George Vickers.

3. At all times material hereto the S. S. George Vickers was owned by respondent, the United States of America, and operated by T. J. Stevenson & Co., Inc., under an agreement of general agency.

4. On February 12 and 13, 1946, the S. S. George Vickers was moored at Pier 80, South, in the city of Philadelphia, having been moved there from a berth at Port Richmond, Philadelphia.

5. On the afternoon and evening of February 12, the decedent went ashore on liberty on two occasions. On the first occasion he was accompanied by Gulbank Suvagian, an ordinary seaman; on the second occasion he was accompanied by Suva-

---

Freedman, Landy & Lorry, Philadelphia, Pa., for libelant.

1. The libel also claimed damages under the Pennsylvania survivor ship statute, but this cause of action was waived after trial.

gian and a messman named Johnson. During these two trips ashore he consumed a considerable quantity of liquor. On the first of the two trips ashore he was engaged in a scuffle with an unidentified seaman and as a result of a fall on the pavement, suffered a bloody face.

6. Vervaecke, Suvagian and Johnson returned to the S. S. George Vickers at approximately 12:30 A.M. on the morning of February 13.

7. At that time the only available means of ingress to the vessel was a straight wooden painter's ladder, which extended from the edge of the pier to the ship's rail, just aft of the midship housing. The ladder was inclined at an angle of about sixty degrees with the horizontal. The vessel was light, and the ladder was secured in such a manner as to allow for the movement of the ship away from the pier. The area about the ladder was well lighted. The ladder had round wooden rungs, spaced approximately one foot apart. Some of these wooden rungs had been replaced with round pipe rungs, which were about one inch in diameter. These pipe rungs fit loosely into the sockets of the two uprights of the ladder. The vessel was also equipped with a standard accommodation gangway which had steps, stanchions and hand holds; this gangway was not in use at the time.

8. When the three men arrived at the ship, Suvagian started up the ladder, followed by Vervaecke, with Johnson in the rear.

9. While Suvagian and Vervaecke were both on the ladder, Vervaecke fell over backwards from a height of some four feet. He landed on his back on the ground and was rendered unconscious by the fall.

10. Suvagian descended the ladder and conferred with Johnson, then went up on deck and lowered a cargo net by means of the cargo winch. Vervaecke was placed in the net and hoisted aboard. He was then put to bed by Johnson and Suvagian, assisted by Peverill, the night watchman, who had been attracted to the scene by the sound of the winch.

11. A short time after Vervaecke was put in his bunk, Pavia, the Chief Mate, returned to the vessel and was informed of the incident by the night watchman. This was about 1 A.M. Pavia went to Vervaecke's room, examined him for broken bones and observed his breathing. He instructed the night watchman to look in on Vervaecke occasionally, and went to bed.

12. Between 2 and 3 A.M., Jones, the Second Mate, and Flax, the Purser-Pharmacist's Mate, went to Vervaecke's room, after being informed that he had fallen. They examined him for possible injuries and tried to awaken him by shouting at him and shaking him. They were unable to arouse him by these methods, nor were they able to awaken Suvagian, who was sleeping in the same room, so they left and went to bed.

13. Vervaecke was found dead in his bunk at 11 A.M. A coroner's jury found that he "died of subdural hemorrhage of the brain, probable acute alcoholism * * *" in accordance with an autopsy report. The coroner's physican, who performed the autopsy, supplemented this verdict at the trial, by testifying: (1) that the immediate cause of death was the pressure on the brain of the hemorrhage, which was caused by trauma, or a blow on the head; and (2) that Vervaecke was deeply intoxicated at the time of his return to the vessel. The estimated time of death was between 8 and 9 A.M.

## Discussion

Libellant contends that respondent's negligence in failing to provide a safe means of ingress to the vessel was a proximate cause of Vervaecke's death. The proofs do not support this contention.

I found that the ladder which was in use on the morning of Vervaecke's death was defective. It contained one or more pipe rungs in place of the original wooden rungs, and these pipe rungs did not fit properly into the uprights of the ladder, so that they were likely to slip or turn under the feet of persons using the ladder.[2] However, it

---

2. In addition to asserting that respondent was negligent in allowing this condition

to exist, libellant also claims that this defect in the ladder rendered the vessel

has not been established that Vervaecke's fall was caused, as libellant contends, by the slipping of one of these loose rungs under his feet.

■ There was no testimony by anyone who actually saw the accident. Johnson, the messman, was standing below Vervaecke when he fell from the ladder and was the only one in a position to see what actually happened. However, he was not available at the time of trial, nor was his deposition ever taken.

Suvagian was the only other person in the immediate vicinity at the time. He was ascending the ladder ahead of Vervaecke and was looking up at the moment. He stated in his deposition that he heard Johnson shout that Vervaecke had fallen, turned around, and saw Vervaecke lying unconscious on the ground. He could only state as a certainty that Vervaecke was on the ladder when he fell. He was unable to say from what height the fall occurred. He did not say that Vervaecke slipped by reason of stepping on a loose rung.

■ Peverill, the night watchman, testified that he first learned of the incident when he saw Suvagian and Johnson carrying Vervaecke to his bunk. Therefore, any testimony he gave as to what took place before he came on the scene was clearly hearsay as far as establishing how the accident happened, although it may have been admissible to show that the vessel's officers had notice of the accident.

■ Libellant has pointed out that the measure of proof necessary to show that respondent was at fault herein is determined by the maritime law, and that the rule in admiralty is that negligence can be shown by circumstantial evidence. This is an accurate statement of the general rule, but the circumstantial evidence relied on here failed to establish negligence.

■ The post-mortem examination showed that Vervaecke's blood had an alcohol content of 0.12% by volume, and that his urine had an alcohol content of 0.35% by volume. Dr. Gouley, the coroner's physician, interpreted these findings to mean that Vervaecke was "deeply intoxicated" at the time of the accident. It was established by the depositions of Suvagian and Jones, the second mate, that the ladder was inclined at an angle of approximately sixty degrees with the horizontal. It is certainly no easy task for a man who is "deeply intoxicated" to make his way up such a steeply inclined ladder. On the basis of the proofs presented to me, I do not find it any more likely that Vervaecke's fall was attributable to the defective condition of the ladder than to his own inability to keep his balance, due to his intoxicated condition. While circumstantial evidence could possibly support a verdict for libellant, liability cannot be predicated on mere speculation. The Jones Act requires, at a minimum, that libellant prove his case "by a preponderance of the evidence". Cruse v. Sabine Transp. Co., 5 Cir., 1937, 88 F.2d 298, 300, certiorari denied, 1937, 302 U.S. 701, 58 S.Ct. 20, 82 L. Ed. 541. See also Sandoval v. Fruit Express Co., 1944 A.M.C. 580 (D.C.D.C.Z. 1944).

There was no evidence that respondent was negligent in the use or maintenance of the ladder in any respect other than with regard to the defective rungs. The testimony was abundant that the area about the ladder was well lighted. Further, the use of a straight ladder at the time, instead of the standard accommodation gangway, was shown to be perfectly proper. Both the second and chief mates explained that the light condition of the vessel, coupled with the high winds which were brushing the ship away from the dock, would have made the use of an accommodation gangway extremely dangerous. In short, libellant has been compelled to rely on the theory that it was a loose rung in the ladder which caused Vervaecke's fall, and he has failed to meet the burden of proof in his attempt to establish this.

unseaworthy. The latter claim must be rejected without further consideration, since a cause of action for unseaworthiness, being an admiralty cause of action, does not survive the death of a deceased seaman. Robinson, Admiralty, p. 340. See also O'Neill v. Cunard White Star Ltd., D.C.1946, 69 F.Supp. 943.

490

With regard to libellant's second claim—that respondent was negligent in failing to provide Vervaecke with medical attention—it is necessary to determine only whether the failure of the ship's officers to summon a doctor upon learning of his fall amounted to negligence under the circumstances. Libellant contends that the ship's officers "had been made aware of sufficient facts to know that they did not have enough medical knowledge to decide whether Vervaecke was drunk or had suffered a more serious injury, and that it was imperative that a physician be called for that purpose."

I have found that Vervaecke was examined on two separate occasions between 1 and 3 A.M. on the morning of February 13. The first examination was made by the chief mate, Pavia, about 1 A.M. Pavia was notified of the incident by the night watchman as soon as he came aboard. He was told that Vervaecke had fallen from the ladder, and had been brought aboard in a cargo net and put to bed. He went to Vervaecke's bunk, examined him for broken bones and observed his breathing; then instructed the night watchman to look in on him occasionally and went to bed. No attempt to awaken Vervaecke was made at this time. With regard to this examination, it is libellant's contention that, having been informed that Vervaecke had fallen, it was incumbent upon the chief mate to inquire either of Johnson or Suvagian, in order to find out exactly how the accident happened, and that Pavia showed a great deal of callousness in failing to do this.

I cannot find that Pavia was derelict in his duty; or that he acted unreasonably, either in failing to call a doctor to ascertain the extent of Vervaecke's injuries, or in failing to inquire further into the details of the fall.

Pavia testified that he had last seen Vervaecke on the afternoon of February 11, and had noticed that his face was "badly bruised" and his right hand "badly swollen". When he asked Vervaecke how he had received these injuries Vervaecke told him that he had been in a fight. Pavia stated that when he examined Vervaecke in his bunk immediately after the accident he did not notice any marks on his face or head that were not also there on the afternoon of the 11th. He stated further that on all occasions on which he had seen Vervaecke during the three days that the vessel was in port prior to the accident, the latter appeared to be "under the influence of alcohol"; that during his examination of Vervaecke immediately after the accident, he "couldn't get too close to him because he reeked pretty bad with alcohol"; and that his only conclusion as to Vervaecke's condition at that time was "that he was dead drunk".

The very fact that Pavia went to Vervaecke's room to see if there was anything wrong indicates that he was conscious of his responsibility as chief mate. A man without medical training cannot be expected to foresee any and all types of injuries that may have resulted from a fall of a few feet. Potter Title and Trust Company v. Ohio Barge Line, 3 Cir., 1950, 184 F.2d 432, 436, certiorari denied, 1951, 340 U.S. 955, 71 S.Ct. 567, 95 L.Ed. 689. Pavia gave Vervaecke a reasonably thorough examination. He had reasonable grounds for concluding that the latter was merely intoxicated. His course of conduct in not carrying the matter any further cannot be considered unreasonable or negligent solely because he overlooked the possibility of an internal hemorrhage that only a physician could have diagnosed, even though that hemorrhage ultimately proved to be fatal.

I have found that Vervaecke was examined a second time, between 2 and 3 A.M., by the second mate and purser-pharmacist's mate. It is with respect to this examination that there is some conflict in the depositions.

Jones, the second mate, stated that upon his return to the ship he was told that Vervaecke had fallen and been brought aboard this ship in a cargo net. He stated that Flax, the purser-pharmacist's mate, was already aboard when he returned; that the two of them went to Vervaecke's room together and examined him; that they tried to awaken him by shouting at him and shaking him, but were not alarmed when he

did not respond since they were also unable to arouse Suvagian, who was sleeping in the same room, though they used the same methods on him. Jones stated that both men smelled of liquor, from which he concluded that they were "passed out drunk".

Flax' story is somewhat different. He stated that he went to Vervaecke's room about 2 A.M., not with Jones but with the second engineer, to see whether Vervaecke's injured hand had been X-rayed while he was ashore. He stated that he tried to wake him, and, when he didn't respond, decided to leave the matter go until morning. In response to a question by libellant's counsel he stated that if he had been advised that Vervaecke had fallen, he would have summoned a doctor at that time. He denied seeing or speaking to Jones between the time he returned to the ship and the time he went to bed. It is libellant's contention that since Flax, the officer most qualified to decide whether a doctor would be needed, was on board immediately following the accident, the other officers were negligent in failing to report the incident to him.

There is no merit to this contention. I have found that Flax' decision to "let it go till morning" was made after learning of the fall from Jones. I had little hesitancy in rejecting Flax' denial that he spoke to Jones before going to Vervaecke's room. Flax signed a statement the day after the accident which included the words "As I started below I met the second mate and together we went into his (Vervaecke's) cabin. * * *" When he was confronted with this statement on cross-examination, he couldn't remember who the second mate was at the time of the accident, then conceded that it was "possible" that it might have been Jones. Weighing this testimony against Jones' unequivocal assertion that the two of them conducted the examination together, I have little doubt as to who was telling the truth. Furthermore, the contradictory effect of the signed statement on Flax' denial of any conversation with Jones, in addition to his failure in general to give straightforward answers on cross-examination, renders his entire deposition unreliable. Accordingly, I have given very little weight to anything else he may have said therein.

Accepting Jones' deposition as the correct version of the examination made by the purser and himself, did these two officers, any more than the chief mate, have reason to be alarmed at Vervaecke's condition? I find that they did not. Jones had been told that Vervaecke had fallen "right at the bottom of the gangway"; he had no reason to suspect that such a fall would produce severe injuries. He went with the purser, who was the officer primarily responsible for the medical care of the ship's personnel, to Vervaecke's room. The two officers found both Vervaecke and his roommate breathing heavily and smelling of alcohol. Neither man would respond to vigorous attempts to awaken him, from which it was concluded that both were heavily intoxicated. As brought out on cross-examination of Dr. Gouley, the coroner's physician, it is not a rare occurrence, even in hospitals, for a subdural hemorrhage to be mistaken for a simple case of intoxication.[3] It is not usual to call in a physician for every case of intoxication that is accompanied by a fall. The normal reaction of a reasonable person, when an individual is found as drunk as Vervaecke was, is to let him "sleep it off", and that is exactly what was done here.

Unfortunately, the decision to let Vervaecke "sleep it off" turned out to have tragic consequences; but that in itself does not mean that it was made frivolously. Under all the circumstances of this case, I cannot find that it was an unreasonable decision, or that the conduct of the ship's officers in making it amounted to negligence. See Potter Title & Trust Co. v. Ohio Barge Line, supra.[4]

3. In fact, alcoholism alone, without any history of trauma, is considered one of the causes of hemorrhages such as Vervaecke suffered. See Alpers, Clinical Neurology, p. 366 (2d Ed.1949).

4. In its answer, respondent raised the issue of libellant's capacity to maintain this action, since he was appointed by a Pennsylvania court to administer the estate of a Wisconsin resident. In view

492

Accordingly, I state the following Conclusions of Law.

1. Libellant has failed to sustain the burden of proof in his attempt to establish that the fall suffered by Alvin R. Vervaecke from the ladder leading to the deck of the S. S. George Vickers was caused by respondent's negligence in any respect.

■ 2. There was no negligence or dereliction of duty on the part of the officers of the S. S. George Vickers in failing to provide Vervaecke with medical treatment after learning that he had fallen.

3. The officers of the S. S. George Vickers had reasonable grounds to conclude that Vervaecke was merely intoxicated and that he did not require medical attention.

4. The cause of action against the United States of America and the United States Maritime Commission should be dismissed.

An order may be submitted in accordance herewith.

of the disposition I have made of the case on its merits, it has been unnecessary to discuss this contention. For a general discussion of the problem of capacity to maintain Jones Act actions, see Willis v. Pan American Refining Corp., D.C.Md.1939, 26 F.Supp. 990. See also Pearson, Adm'x v. Conover, 1942, 47 Pa.Dist. & Co. 387.