Knud H. MADSEN, Libelant

v.

UNITED STATES of America,
Respondent,

v.

DUMAC SHIP CEILING CO., John F. Du-
gan, Leo Morris and John F. McNa-
mara, Respondents-impleaded.

No. 403 of 1957.

United States District Court
E. D. Pennsylvania.

June 30, 1960.

Marshall J. Seidman, Richter, Lord & Levy, Philadelphia, Pa., for libelant.

Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., Alan Raywid, (Admiralty and Shipping Section), Department of Justice, Washington, D. C., for respondent.

John Paul Erwin, Philadelphia, Pa., for respondents-impleaded.

EGAN, District Judge.

This libel in personam was brought against the United States pursuant to the Suits in Admiralty Act, 46 U.S.C. § 742. Libelant was a relief night mate working the midnight to 8 A.M. watch on respondent's ship, the James J. Hill, who was injured by being thrown from a ladder while reporting off duty at 7:55 A.M. on the morning of June 5, 1957. He seeks to recover damages alleging (1) that the vessel was unseaworthy; (2) negligence under the Jones Act, 46 U.S.C. § 688; and (3) for maintenance and cure. United States impleaded Dumac Ship Ceiling Co., a partnership composed of John F. Dugan, Leo Morris and John F. McNamara, collectively referred to herein as DUMAC.

The cause having been submitted to the Court on the basis of pleadings, testimony, depositions and exhibits, and oral argument having been waived, we make the following

Findings of Fact.

1. Libelant, Knud H. Madsen, at all times material hereto, was employed as a night relief mate aboard the James J. Hill, owned by the United States.

2. The James J. Hill was a Liberty type vessel owned by the Government which in May of 1957, while anchored in the James River Reserve Fleet, above Norfolk, Virginia, was being used for the storage of Government-owned grain. She had been decommissioned and was classified as a "dead" ship in the "Mothball Fleet."

3. In May, 1957, respondent appointed a licensed master of vessels to take charge of the James J. Hill, supplying him with a six man riding crew, all of whom were licensed mariners, for the purpose of towing the vessel from the James River to the Port of Philadelphia, Pennsylvania, for discharge of her cargo at the Girard Point Grain Terminal.

4. Before undertaking the contemplated voyage on May 29, 1957, the master inspected the vessel to satisfy himself that she was seaworthy. During the course of the voyage, the master kept the usual log required of vessels in navigation; the vessel was subject to the rules of the nautical road; the vessel displayed the required lights; she was moved by tugs during the course of the voyage from the James River to Philadelphia since she had no power of her own.

5. When the vessel was moored in navigable waters at Girard Point on June 2, 1957, the master remained aboard during working hours, from 8 A.M. to 5 P.M., to supervise her discharge. Respondent supplied the master with four ship cleaners and a ship cleaning foreman, and four deck men and a deck foreman to assist the master in seeing that the holds of the vessel were properly cleaned after discharge and that the vessel was properly moored during business hours while she was tied up at Girard Point.

6. After business hours, i. e. during nonworking hours, respondent employed two teams of night mates and gangway watchmen aboard the vessel to safeguard her. The first team, whose names are unimportant, took the watch from 4 P.M. to 12 midnight; the second team, of which Madsen was the night mate, took over from 12 midnight to 8 A.M. It was during this watch that the accident happened. Both Madsen and the gangway watchman who attended him were placed aboard the James J. Hill by respondent's agent, Shepard Steamship Company, acting through its local agent, the Hinkins Steamship Company.

7. At the conclusion of the discharge operation on June 12, 1957, respondent

sent another master aboard the vessel, together with another riding crew, to return her in tow to her mooring in the James River where she arrived on June 14, 1957.

8. The James J. Hill carried in her 'tween deck the regular accommodation ladder with which she was originally equipped, and in addition thereto, she was equipped with a common painter's ladder about 35 feet high, which she utilized for the purpose of providing ingress and egress for persons having business aboard her while at Girard Point.

9. While not new, the ladder was not defective and was reasonably safe for the use to which it had been put. It was secured at the top by a lashing at the gunnel and rested on its bottom in cinders on the dock. The vessel was moored with two bow lines, two spring lines and two stern lines, the latter being each of 8″ manila. The inboard bow and stern lines and the two spring lines were each about 60 feet long. The outboard bow and stern lines were each about 120. feet long.

10. All of the ship's lines were permitted to have slack in them and were permitted to fall into the water; the movement of tides and traffic passing in the river caused the vessel to surge to and fro along the dock and to float out from the dock in uneven movements.

11. During working hours from 8 A.M. to 5 P.M., the vessel was adequately manned because in addition to the five cleaners and five deck men on the vessel under the command of the master, there was a gang of twelve stevedores, furnished by Dumac, including a stevedore foreman and a stevedore supervisor.

12. The vessel was *not* adequately manned from 5 P.M. to 8 A.M. each day because the respondent supplied her solely with a night relief mate and a gangway watchman. The night relief mate was physically unable to handle the lines by himself or with the combined efforts of the gangway watchman. Besides, union regulations would not permit them to handle the mooring lines.

13. Every morning when the working crew reported for the purpose of discharging the vessel of its cargo of grain, they found that the ship had worked herself away from the dock and it was necessary to bring her back to the dock by tightening her slack lines before undertaking the day's operations.

14. On June 5, 1957, at approximately 7:55 A.M., the libelant, Madsen, was leaving the vessel after the completion of his eight-hour duty as night relief mate. He mounted the straight ladder to descend to the pier and successfully maneuvered several rungs, at which point the vessel suddenly surged forward about 5 to 8 feet, causing the ladder to upend and throw the libelant about 20 feet from it to the pier below where he landed on his back, suffering painful injuries.

15. Libelant was removed by a police ambulance to the Methodist Hospital, Philadelphia, where he remained for 33 days. For the first two weeks of his hospital stay, he was required to remain on his back in bed without moving. Upon his discharge he was instructed to report back for out-patient treatment, to take assigned exercises, to refrain from strenuous activities and to wear an orthopedic corset.

16. In addition, libelant was required to report to the U. S. Public Health Service, Out-Patient Clinic, in Philadelphia, from August of 1957 until June 5, 1958. During this entire period he was examined monthly by physicians attached to the Out-Patient Clinic and found unfit for duty.

17. On June 5, 1958 he was given a fit for duty slip by the physicians at the U. S. Public Health Service, although he still had complaints referable to the injuries sustained on June 5, 1957.

18. As a result of the fall which he suffered on June 5, 1957, libelant sustained a compression fracture of the first lumbar vertebrae, which was healed with a loss of two-thirds of the vertebral height, anteriorly. This structural defect was associated with a disturbance

of the dorsal joints. In addition, libelant has sustained a traumatic spondylitis and a chronic lumbo-sacral strain, secondary to the compression fracture. These conditions are permanent and account for libelant's complaints of pain which will continue into the future.

19. Libelant was totally disabled for a period of one year from the date of the accident on June 5, 1957 to June 5, 1958, when the physicians at the U. S. Public Health Service gave him a fit for duty slip.

20. Doctor George J. Burden rejected libelant for seagoing employment on two separate occasions in 1959 because of the accident suffered on June 5, 1957, but this does not warrant a factual conclusion that he would have gone to sea in the future.

21. Libelant is a licensed master of vessels having attained that rank by examination in 1930. Starting as an ordinary seaman, libelant has sailed as a first, second and third mate. He voluntarily ceased going to sea on vessels in 1953 and there is no convincing evidence that he would again sail aboard a seagoing ship in any capacity. He was 57 years old at the time of the accident and had reached the age of 60 at the time of trial.

22. In the Port of Philadelphia, an individual devoting himself exclusively to serving as a night mate may expect to make about $3,000 per year, while an individual sailing regularly as a second mate could expect to make about $10,000 per year. Under the union contract, age is no bar to going to sea as a second mate if the applicant can pass a required physical examination.

23. Libelant required one year from the date of his accident on June 5, 1957 to obtain maximum cure for his injuries, during which period he was under treatment for them.

24. Libelant received $8 per day for maintenance and cure, according to the contract rate, from the Shepard Steamship Company, as agent for the respondent, from the date of the accident on June 5, 1957 until January 22, 1958, from which date respondent refused to pay him any maintenance and cure. Accordingly, from June 5, 1957 until June 5, 1958, the evidence shows that the libelant was required to maintain himself for 116 days, and that he is entitled to be reimbursed for this amount in the total of $928.

25. At Girard Point there is a rise and fall of about 6 feet in the tide; the tide changes every six hours; thus over a period of twelve hours a moored vessel would rise and fall a combined distance of 12 feet.

26. The vessel was inadequately manned and not properly moored during the off work hours. There was too much slack in the lines and this, in addition to the tidal conditions present at the time and place of the accident, permitted and caused the surging of the vessel and the upending of the ladder, causing the libelant, in the course of his employment, to fall and sustain the injuries noted.

27. Libelant has failed to sustain his burden of proving that the respondent, United States of America, was negligent in the use and maintenance of the straight ladder for egress from the James J. Hill.

28. While the James J. Hill had undergone complete deactivation in 1952 and had been removed from navigation as a ship with the capacity and ability to sail under her own power, she was reasonably fit for the use to which she had been put as a floating granary and was seaworthy for such purpose, just as if she had been converted into a barge for the storage and carriage of grain in navigable waters.

29. Libelant was not guilty of contributory negligence and the raincoat he carried over one arm did not cause or contribute to the happening of the accident in any way.

30. Libelant has sustained his burden of proving that the respondent was negligent in providing libelant with an unsafe place to work aboard a vessel that was unseaworthy and that respondent

was negligent in failing to provide an adequate crew to keep the vessel properly moored at the time and place of the accident.

31. The Government, as respondent, filed a cross-complaint against Dumac and its individual partners who were the stevedore contractors, on the theory of indemnity based on two contracts. One is in writing and is embodied in three letters between the United States Department of Agriculture and Dumac, namely, an invitation to bid, a bid by Dumac, and an acceptance of the bid by the Department (exhibits R–6–A, R–6–B, R–6–C, Tr. 499–501); the other is an oral contract entered into by the United States Maritime Commission by its agent and Dumac, wherein Dumac agreed to supply labor to the ship to be placed under the direction and at the disposal of the ship's master on a cost-plus arrangement.

32. The evidence establishes that the ship's master retained and exercised complete control over the vessel while she was in the Port of Philadelphia; that he remained aboard her at all times from 8 A.M. to 5 P.M. when he took off for a local hotel where he stopped overnight, returning to the vessel in the morning; that a relief mate took over when he was not aboard and that the latter reported to the master and was under his general supervision and control.

33. The evidence fails to establish that the respondents-impleaded did anything in their capacity as stevedores which caused the vessel to be unseaworthy, and also fails to establish that they were negligent in the performance of their duties while unloading, shifting or mooring the vessel.

34. The evidence fails to establish that the respondents-impleaded are liable over to the Government for any damages suffered by libelant on any theory of indemnity, either by way of contract or under the General Maritime Law.[1]

35. Libelant is entitled to recover damages from the respondent in the sum of $15,000, plus maintenance and cure in the amount of $928, or a total of $15,928.

## Discussion

Unseaworthiness under the General Maritime Law and negligence under the Jones Act give rise to separate and distinct causes of action. At times they may be combined to bring about the same result—and this without a showing of prior or constructive notice on the part of the shipowner. This is made abundantly clear by the Supreme Court in Mitchell v. Trawler Racer, Inc., 1960, 80 S.Ct. 926. This case is so recent and its discussion of the subject so exhaustive that it would serve no useful purpose to analyze it here.

The case closest to this on its facts in this district is that of Landy v. United States et al., D.C., 101 F.Supp. 486, decided by Circuit Judge Kalodner sitting as a District Judge. That was a libel for the recovery of compensatory damages for the death of a seaman filed by his administrator. The case proceeded on the theory of negligence under the Jones Act since unseaworthiness, being an admiralty cause of action, does not survive the death of a seaman. There, the seaman fell backwards from a wooden painter's ladder which extended from

1. The specific provisions on which respondent relies for indemnity read as follows:

"Bids are to be for discharging on a straight time basis only, and will include insurance, social security, welfare, pension, vacation fund and shifting of the vessel." Ex. R–6–A, 2nd par. Tr. p. 499.

"Neither the Maritime Administration nor the U. S. Department of Agriculture, Commodity Stabilization Service, or their agents, shall be held responsible for any consequences that might result from the failure of any ship's gear in use by the stevedore contractor." Idem, 4th par. Tr. p. 499.

"It is imperative that all grain be removed from the vessel, vessel swept clean and caution exercised to prevent damage of the vessel's ventilating tubes." Indem, 5th par. 1st sentence. Tr. p. 500.

None of these provisions is applicable.

the edge of the pier to the rail of the vessel. It was the only means of access and he was climbing it to board the ship while under the influence of liquor. There, as here, it was alleged that the ladder was defective and contrary to our finding, the Trial Judge there found that it was defective but he also found that it had not been established by a fair preponderance of the evidence that the slipping of a loose rung had caused the accident and the libel was dismissed. The case is important, too, for the further reason that the Court found that "* * * the use of a straight ladder at the time, instead of the standard accommodation gangway, was shown to be perfectly proper." We reach the same conclusion.

Since liablity here is also predicated on negligence in handling the mooring lines to prevent the inordinate surging of the vessel, an important question is, "Who had the responsibility for seeing that the vessel was properly moored at the time of the accident?" The evidence establishes beyond any doubt that it was the direct responsibility of the respondent from 4 P.M. until 8 A.M. the following day; that the accident happened 7:55 A.M. just about the time the master, the stevedores and the other workmen were reporting for duty; and that it could have been avoided if there were sufficient men kept aboard the vessel to tend to the mooring.

█ Inadequacy of crew constitutes an act of unseaworthiness. We have found that the only persons aboard, at and prior to the time of the accident who might have pulled the mooring lines taut, were the relief mate (libelant) and the gangway watchman or marine guard as he is familiarly known. These two were not up to the task physically and were not available anyway because they were disqualified from handling the lines by union regulations.

"Seaworthiness is a comprehensive term, and a relative one. The requirement is that the vessel not only be staunch and strong, but also that she be fitted out with all proper equipment in good order, *and with a sufficient and competent crew and complement of officers. * * *"* (Emphasis supplied.) The Law of Admiralty, Gilmore and Black, p. 58.

On this question generally, see Carlisle Packing Company v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927, and The Magdapur, D.C.S.D.N.Y., 3 F.Supp. 971.

Respondent objects to any allowance for maintenance and cure on the ground that at no place in the libel is any claim made therefor. While it probably would have been better practice to have stated it as a separate cause of action, we believe that the respondent was put on notice that such a claim was being made by the language of paragraph 6 of the first cause of action reading, "* * * has lost, and will lose, large sums of money which he otherwise would have earned as wages and in the form of board and lodging; that he has been forced to defray the expense of his maintenance and cure; and that libelant verily believes he has been permanently injured; all to his damage * * *."

To the same effect, see The Magdapur, supra, at page 973, where the Court said: "The fact that the libel does not specifically pray such relief is not conclusive; maintenance and cure may be awarded where the libellant asks for compensatory damages and 'such other and further relief in the premises as in law and justice he may be entitled to receive' ", citing The Teviotdale, D.C., 166 F. 481; The New Dawn, D.C., 36 F.2d 970, 971.

█ On the record before us, there is no question but that libelant was a seaman employed by the respondent; that he was injured during the course of his duty while leaving his place of employment aboard ship by means of a ladder provided for that purpose when the ship, which was improperly moored, surged inordinately, causing the ladder to roll over and upend, with resulting injury to libelant. By reason thereof and the negligence of respondent in failing to provide an adequate crew to keep the

vessel properly moored, and in failing to provide him with a safe place in which to work, he is entitled to maintain actions for maintenance and cure, for damages under the Jones Act and for unseaworthiness under the General Maritime Law. Tyndall v. The Conduit and Foundation Corporation, 3 Cir., 1959, 269 F.2d 947.

The fact that libelant's decedent was working on a "dead" ship (a tug) when he was drowned was held to be not controlling in Desper v. Starved Rock Ferry Co., 1952, 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205. For an interesting discussion of the development of the law leading to the conclusion in that case, see the opinion of Chief Judge Biggs in Tyndall v. The Conduit and Foundation Corporation, supra, 269 F.2d at pages 948–949. See also Norton v. Warner Co. (successful claimant was employed on a barge lacking motor power of its own) 1944, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931, a case that went up from the 3rd circuit.

■ The evidence fails to establish any negligence on the part of the respondents-impleaded. Furthermore, they were not in control of the vessel and were under no obligation to moor it or to supply a crew to do so at the time of the accident. The cross-libel against the respondents-impleaded will be dismissed.

Conclusions of Law

1. This Court has jurisdiction over the parties and the subject matter.

2. Libelant was in the employ of the respondent in the capacity of a seaman acting as night mate at the time of the accident.

3. Respondent was negligent and its negligence was the proximate cause of libelant's injuries in failing to furnish libelant with a vessel that had an adequate crew, to moor her properly and to keep her moored properly at the time of the accident.

4. That respondent failed to supply libelant with a safe place to work for similar reasons.

■ 5. That libelant is entitled to recover the sum of $15,000 in damages from the respondent, as well as the sum of $928 for maintenance and cure, or a total of $15,928.

6. That judgment will be entered in the sum stated for the libelant and against the respondent.

7. The cross-libel filed by the United States against the respondents-impleaded will be dismissed.

Counsel for libelant will submit an appropriate order.