James E. GRANTHAM, Sr., as Administrator of the Goods, Chattels and Credits of James E. Grantham, Jr., Deceased, Appellee,

v.

The QUINN MENHADEN FISHERIES, INC., Appellant.

No. 9764.

United States Court of Appeals Fourth Circuit.

Argued March 2, 1965.

Decided March 30, 1965.

B. Allston Moore, Jr., and Harold A. Mouzon, Charleston, S. C., (Moore, Mouzon & McGee, Charleston, S. C., on the brief) for appellant.

A. Arthur Rosenblum and Harvey M. Spar, Charleston, S. C., for appellee.

Before SOBELOFF and J. SPENCER BELL, Circuit Judges, and HUTCHESON, District Judge.

J. SPENCER BELL, Circuit Judge.

This suit in admiralty resulted from the death by drowning of James E. Grantham, Jr., a member of the crew of the REDWING, a fishing vessel owned and operated by the respondent. It was conceded that the deceased met his death in the course of his employment. The case was tried before the district court sitting without a jury, and a judgment in favor of the plaintiff was entered.

On the morning of July 7, 1959, the REDWING put to sea to catch commercial fish, and upon its return it docked at the respondent's wharf in a navigable tidal river at Yonges Island, South Carolina. Tied astern were two motorized purse boats, each of which was thirty feet long. Stretched between the purse boats was the net which had been used during the day's operations; the net was being cleaned for use the next day. It was the regular practice of the crew to clean the net as it was pulled from one purse boat into the other, then to clean out the empty boat, and finally to transfer the net back to the clean boat so that the other boat could in its turn be cleaned. During the cleaning process, the crew came in contact with fish oil and scales, and it was customary for most of them to go in the river to wash off while the empty boat was being cleaned. This had been done on previous occasions with the knowledge and consent of the captain, and it occurred on this day with the express consent of the mate.

After the net had been transferred to the purse boat lying nearest the wharf, six or seven of the crew jumped into the river and swam around. The last man to enter the water was the decedent, who dived in from the purse boat farthest from the wharf. A two-mile ebb tide was running from bow to stern of the RED-WING and its purse boats. The deceased, who was apparently seized by a cramp, began to struggle as soon as he came up from his dive. According to several witnesses, at this time he was about forty feet to the stern of the purse boat from which he had dived, in water about twenty feet deep. While there was a conflict in the evidence as to the deceased's skill, there was no question that he was able to swim, for he had engaged in this practice on prior occasions.

When Grantham came to the surface after his dive, he began to splash the water, giving the appearance of struggling to stay afloat. The superintendent of the respondent's nearby processing plant, who happened to be watching the men from shore at the time, called out that the deceased was drowning. Carmeno, one of the crewmen who was cleaning out one of the purse boats, threw a line from the stern of the mate's boat toward the deceased, but it fell short. Another crewman threw a life ring or buoy which apparently came from the REDWING, but it likewise fell short. The court found that the line was too

short to reach the decedent. The life ring had no line attached to it, and it therefore could not be pulled in and rethrown. Lonnie Hall, a member of the crew who was swimming nearby, sought to aid the deceased; but when he reached him, the deceased grabbed Hall and pulled him under. After a struggle Hall managed to break the deceased's grip and came to the surface, at which time a third member of the crew swam to Hall with the life buoy which had fallen short. The deceased did not again come to the surface. His body was found some hours later a considerable distance from where he was last seen.

The district court found that there was no lifesaving equipment in the purse boats. It also found the members of the crew were ignorant of the location of the life jackets which were stored aboard the REDWING and that they had had no instruction in the use of the lifesaving equipment which the vessel carried. There was evidence that two life buoys were available on the deck of the REDWING, but there were no lines attached to them. Apparently it was one of these buoys which was thrown into the water some ten feet from where the deceased was struggling for his life.

On these facts, found by the court from evidence which was conflicting only in minor detail, the court concluded that the respondent was negligent in certain particulars and that its negligence was the sole proximate cause of the deceased's death.

■ The respondent contends that the court's findings of fact regarding its negligence are clearly in error. With this assertion we cannot agree. There is ample evidence in the record to support the court's findings; indeed, it is difficult to see how the court could have made any other finding on the evidence before it. The major thrust of the respondent's argument is that on these facts, its negligence, if any, was not a proximate cause of the decedent's death because he drowned so quickly after his difficulty was observed that no amount of lifesaving equipment could have saved him. The REDWING and its purse boats were subject to certain Coast Guard safety regulations [1] with which the court found they

1. "25.25-10 LIFE PRESERVERS AND OTHER LIFESAVING EQUIPMENT REQUIRED.

"25.25-10(a) All motor vessels shall carry an approved life preserver for each person on board. Motor vessels carrying passengers for hire shall also be provided with an additional number of approved life preservers suitable for children, equal to at least 10 percent of the total number of persons carried.

"25.25-10(b) All motorboats shall carry lifesaving equipment as follows:

"25.25-10(b) (1) Motorboats which carry passengers for hire shall be provided with an approved life preserver for each person carried, and with an additional number of approved life preservers suitable for children, equal to at least 10 percent of the total number of persons carried.

"25.25-10(b) (2) Motorboats of Class 3 not carrying passengers for hire shall carry an approved life preserver or ring life buoy for each person on board.

"25.25-10(b) (3) Commercial fishing motorboats of Class 3 shall carry an approved life preserver, ring life buoy, or wood float for each person on board.

"25.25-10(b) (4) Commercial fishing motorboats of Class A, 1, or 2 shall carry an approved life preserver, ring life buoy, buoyant vest, buoyant cushion, or wood float for each person on board.

"25.25-10(b) (5) All other motorboats not otherwise specifically provided for shall carry an approved life preserver, ring life buoy, buoyant vest, or buoyant cushion for each person on board.

"25.25-10(c) All barges carrying passengers for hire shall be provided with an approved life preserver for each person carried, and with an additional number of approved life preservers suitable for children equal to at least 10 percent of the total number of persons carried when such barges are regularly operated with motorboats or motor vessels or steam vessels.

"25.25-15 STORAGE. 25.25-15(a) The lifesaving equipment on all vessels shall be so placed as to be readily accessible." United States Coast Guard, Rules and Regulations for Uninspected Vessels, dated September 1, 1959.

were not complying at the time Grantham drowned. The respondent itself concedes that

"Aside from statutes and regulations and aside from the humanitarian duty of helping a man in distress and peril, the Courts have held in numerous cases that the shipowner owes a legal duty of rescue to a seaman who has gone overboard and that his duty includes the duty to provide suitable rescue equipment." (Citing Gardner v. National Bulk Carriers, Inc., 310 F.2d 284 (4 Cir. 1962), cert. denied, 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963); Sadler v. Pennsylvania R.R. Co., 159 F.2d 784 (4 Cir. 1947)).

The respondent contends, however, that because the deceased voluntarily went into the water and did not fall overboard by neglect or misadventure, the rescue rule does not apply. He argues that the danger in this case arose after the deceased was in the water and that even if there had been adequate lifesaving equipment, there would not have been time to rescue Grantham. As to the first point, we decline to interpret the rescue rule so restrictively; as to the latter point, the respondent's argument conflicts with what the court below found, and the evidence justifies the court's conclusion. There was time enough for one of the crew men to swim to the struggling man. Had he been aided by adequate equipment, he might have effected a rescue. However, we need not speculate as to what might have occurred had adequate equipment been available, readily accessible, and used by a crew instructed and trained in rescue operations. Sadler v. Pennsylvania R.R. Co., supra at 786; Zinnel v. United States Shipping Bd. Emergency Fleet Corp., 10 F.2d 47, 49 (2 Cir. 1925); cf. Gardner v. National Bulk Carriers, Inc., supra at 287. The facts are that the deceased drowned, that adequate equipment to effectuate a rescue was not available, and that the district court found this absence of appropriate equipment to be the proximate cause of the decedent's death. Not being clearly erroneous, those factual findings are binding upon us. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954).

We have also considered the respondent's contention that the damage award of $25,748.00 was excessive. The deceased was twenty years of age at the time of his death. He was single and was survived by his parents. Both parents testified that he had contributed various amounts at various times to their support since he began earning money some five years before his death. His mother estimated that his contributions amounted to "an average of $20.00 per week." On cross-examination, the mother testified that her son had sent home only $15.00 during the six weeks he had worked with the respondent prior to his death. However, the deceased's father testified that on other occasions he had contributed as much as $35.00 per week to his parents' household expenses. From the evidence before him, it was the district judge's duty to determine the pecuniary loss occasioned to Grantham's parents, as beneficiaries under the Jones Act, by his untimely death. Whitaker v. Blidberg Rothchild Co., 296 F.2d 554 (4 Cir. 1961). We cannot say that the figure decided upon here was either unreasonable or unsupported by the evidence.

The damages allowed by the court below included an award of $2,000.00 for the decedent's conscious pain and suffering. As the respondent concedes in its brief, these damages are largely within the sound discretion of the factfinder, and there is no occasion to disturb the ruling of the district judge on this point.

There being no error, the judgment of the district court is

Affirmed.