Petition of RISDAL & ANDERSON, INC. for exoneration from or limitation of liability as owner of the FISHING VESSEL MIDNIGHT SUN.

No. 63–26–C.

United States District Court
D. Massachusetts.

Jan. 5, 1966.

James A. Whipple, Herbert C. Splane, Frank Handy, Jr., Boston, Mass., for petitioner.

George J. Dodd, John O. Parker, Nathan Greenberg, Boston, Mass., Kline & Gardner, Gloucester, Mass., Barnet & Barnet, New Bedford, Mass., for claimants.

CAFFREY, District Judge.

This is a petition in admiralty for exoneration from or limitation of liability with respect to the loss of the fishing vessel MIDNIGHT SUN and her entire crew of ten members. Claims and answers have been filed by the personal representatives of each of the ten deceased crew members challenging petitioner's claim to exoneration or limitation and asserting that petitioner is liable to the personal representatives of the decedents for all provable damages, under the provisions of the Jones Act, 46 U.S.C.A. § 688, and the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq.

The MIDNIGHT SUN was owned by a Massachusetts corporation, Risdal & Anderson, Inc. The late Magne Risdal was president, treasurer, and a director and principal stockholder of this corporation. The MIDNIGHT SUN was the sole asset owned by the corporation. Magne Risdal was the captain of the MIDNIGHT SUN and was in charge of her during her last voyage. In fact, he had been the active master of the vessel since she was built and launched in 1960. No claim for loss of his life was filed in this case.

The MIDNIGHT SUN was engaged in commercial scallop-fishing from her home port in New Bedford. On the morning of November 7, 1962 she left Kelly's Shipyard at Fairhaven on a voyage to the southern edge of Georges Bank in the general area of latitude 41°N and longitude 67° 30′ W. Magne Risdal was

her Master and the crew consisted of Mate Olav Ferkingstad, Jens Ferkingstad, Sam Lund, Gordon Kallestein, August Larsen, Jan Nilsen, John Wagner, Arne Lindanger, Torgils Holmen and Asbjorn Pedersen. She fished close by three other New Bedford scallopers, the ALOHA, the FLORENCE B., and the FLEETWING, all of which were in the same area, about three or four miles off a fishing buoy which had been put over by the ALOHA. Fishing operations continued normally until bad weather began to make up on November 14th. By this time Captain Risdal was near the end of the eight fishing days which was the maximum permitted by Union rules. At about 2:00 p. m. on November 14th, Captain Risdal communicated via radio-telephone with the mate of the ALOHA and said that the weather had become too bad for fishing and that he was going to head for New Bedford. This was the last communication anyone had with the MIDNIGHT SUN, which has not been seen or heard from since, nor has any wreckage from her ever been found.

At the trial the mate of the ALOHA testified that his position was about 90 miles east of the Nantucket Shoals Lightship at the time of the radio-telephone conversation with Captain Risdal, and I find, on the basis of the fact that the four vessels were fishing together off the same buoy, that the MIDNIGHT SUN was approximately the same distance east of the Nantucket lightship when last heard from. At the time of this radio-telephone conversation the wind was blowing at 45 miles per hour.

The wind intensified and the weather kept getting worse. The mate of the ALOHA testified that by 6:00 p. m. the wind hit 100 miles per hour. This was a visual estimate by the witness since there were no scientific instruments capable of measuring wind velocity on the ALOHA. Witnesses from the ALOHA, the FLORENCE B. and the FLEETWING, none of whom had the benefit of any scientific wind velocity measuring equipment, expressed their opinion that at the height of the storm on November 14th the maximum winds which prevailed in the area where the MIDNIGHT SUN was last heard from were 100 mph, 100 mph, 80 mph, and 70 mph. The official weather bureau records indicate a wind force at Georges Bank of 65 knots and a recording at Nantucket Shoals Lightship of Force 8 on the Beaufort Scale, i. e., 34 to 40 knots.

Petitioner urges that a finding should be made that the storm of November 14th was a technical hurricane, i. e., a storm with winds in excess of 66 knots. While I find that it was a severe storm I also find that it was of less than hurricane strength. In so finding I have in mind, first of all, the official weather bureau records; and, secondly, the discrepancies in the various estimates given by the fishermen who were in the area who "guesstimated" the wind velocity without benefit of any instruments, and whose testimony as to wind speeds I believe to be exaggerated and which I do not fully credit. Witnesses from fishing vessels which were out in that storm testified that the storm of November 14–15, 1962, was as severe as they had ever experienced, although they had been out in storms just as severe previously and had brought their boats safely home, and that they expected during the course of the remainder of their careers to ride out other storms equally severe.

Petitioner elicited testimony that Captain Risdal was more knowledgeable in maritime affairs than the average fishing-boat captain or owner. Despite this, the captains of two and the mate of the third of the vessels which were fishing with the MIDNIGHT SUN all testified that the proper seamanship under the weather conditions then and there prevailing was for the vessel to lay to and ride out the storm rather than try to head back to New Bedford as Captain Risdal stated he was about to do. These three witnesses, who commanded scallopers 17 to 23 years older than the MIDNIGHT SUN, testified that they did lay to, rode out the storm, and safely returned to port. Indeed, the undisputed

testimony was that practically the entire New Bedford dragger fleet of approximately sixty draggers was out in the storm of November 14th and that every one returned safely to New Bedford with the sole exception of the MIDNIGHT SUN. No fishing vessel was lost from the Gloucester, Boston, or any other New England segment of the fishing fleet during this storm.

I rule that Captain Risdal's attempt to return to port was negligent and that this negligence was a proximate cause of the loss of the MIDNIGHT SUN. I rule that there was privity and knowledge on the part of the petitioning corporation of the facts presented by this case in view of Captain Risdal's dual capacity as Master of the vessel and principal executive and majority shareholder of the corporation and that his negligence is imputable to the petitioner.

The second basis of petitioner's liability in this case is the unseaworthiness of the MIDNIGHT SUN. She was built at the Gamage Boatyard, South Bristol, Maine, in 1960, from a basic plan drawn by one Albert Gordon. She was a scallop dragger of approximately 65 ft. in length and 67 gross tons, built of wood, and propelled by a 335 horsepower Diesel engine. During construction of the vessel the design was altered by Mr. Gamage at the request of Captain Risdal. This alteration consisted of lengthening the stem and raising the freeboard. No naval architect was consulted about these changes. These were not the only changes Captain Risdal made in his vessel. In March of 1962 he personally directed the erection of plywood shelters over the scallop-shucking boxes located aft along the rail on either side. The shelters were made by fastening marine plywood sheets upon a steel frame to the height and length of the deckhouse on both sides of the stern portion of the MIDNIGHT SUN. The forward ends of this structure contained plywood access doors on either side of the deck, but it went completely around at the stern thus making a complete U-shaped enclosure at the stern end of the vessel. Both sides of this wooden structure contained hinged wooden doors over the shucking boxes which could be fastened either in an open or shut position. This change in the MIDNIGHT SUN was made at the D. N. Kelley & Son Shipyard, Fairhaven, Mass. The chief carpenter, Joseph N. Richard, testified that it was built under the direction and immediate control of Captain Risdal. The hull superintendent for Kelley testified that his company had neither assumed nor accepted any responsibility for the design or safety of this addition to the MIDNIGHT SUN but was concerned only with the physical erection thereof under the direction of Captain Risdal. I find that this work was done without consulting a naval architect or other marine expert about the effect this structure would have on the stability of the vessel. I also find that the structure was built without written specifications, plans, or blueprints, pursuant to oral instructions of Captain Risdal.

On the basis of expert testimony of naval architects at the trial, particularly that of Dr. Abkowitz, Professor of Naval Architecture and Marine Engineering at the Massachusetts Institute of Technology, I find that it is possible prior to construction of a vessel, once her plans and specifications have been completed, to make a computation of the metacentric height and metacentric radius of the vessel and to plot this information on a graph with other data and thus to determine her essential stability and consequently her seaworthiness. This can be done by making calculations based on weight estimates of the engine, hull, machinery, gear, cargo and stores. After the construction of a vessel it is possible to determine actual, as distinguished from theoretical, metacentric height, and hence actual as distinguished from theoretical stability of the vessel, by performing inclining tests with reference to the vessel. This was not done after construction of the MIDNIGHT SUN, and at no time prior to her last voyage were hydrostatic curves of the vessel

computed, nor was any determination of her metacentric height ever made.

Expert witnesses called by both sides to this controversy testified that they calculated the metacentric height of the MIDNIGHT SUN from her basic plans to be about 1.8 ft., which I find to be "moderate" absent any "degrading factors," i. e., special conditions tending to decrease metacentric height.

I find that the construction of the shelter under the sole direction of Captain Risdal created a condition aboard the MIDNIGHT SUN under which in heavy seas she had a tendency to trap substantial quantities of sea-water in this plywood shelter. I find it significant that structures accomplishing the same purpose as that sought to be accomplished by building this one on the MIDNIGHT SUN have been built on other fishing vessels in the New Bedford fleet, among them the MOBY DICK, with doors fore and aft and without an enclosure going all the way around the stern. An examination of claimants' Exhibit I, which is a photograph of the fishing vessel MOBY DICK, and claimants' Exhibit A, which is a photograph of the MIDNIGHT SUN, graphically demonstrates the far greater proclivity for retaining water in a shelter of the type on the MIDNIGHT SUN with its completely enclosed stern as contrasted with the type of shelter on the MOBY DICK with an open stern. I find that the shelter on the MIDNIGHT SUN was of such a size and shape as to trap a large amount of sea-water so that metacentric height of the vessel would be substantially reduced by a combination of the weight of the structure and the weight and free surface effect of water trapped therein.

There were other "degrading factors" which reduced the metacentric height of the MIDNIGHT SUN. She had three large square scuppers amidships on each side which were fitted with ports or panels to keep them closed at all times except when the crew was working on deck on a catch at which time the scuppers were opened to shovel out trash from the catch, gurry, etc. In addition there were a number of small scuppers around the stern which I find were inadequate to carry off any appreciable amount of sea-water which found its way on to the stern portion of the deck. I find that it was normal practice on the MIDNIGHT SUN to keep the six large amidship scuppers closed while under way, with the result that in heavy seas water was trapped on the deck and this free surface condition reduced the metacentric height of the vessel by at least two feet, which alone would suffice to produce a negative metacentric height and consequently an unstable condition.

I find that the absence of effective longitudinal partitioning in the fish hold tended to further reduce the metacentric height. Furthermore, the MIDNIGHT SUN carried two 14-foot dories on top of the pilot house, neither of which was customarily covered by canvas as is done by some but not all of the fishing vessels in the New Bedford fleet, and I find that the water likely to collect in these open dories in heavy seas would still further reduce the metacentric height.

I find that these "degrading factors" eradicated the moderate 1.8 ft. metacentric height of the MIDNIGHT SUN and produced a negative metacentric height during the storm, thereby rendering the vessel unstable and unseaworthy; and that it is more likely so than not so that the MIDNIGHT SUN was lost during this storm because she was rendered unseaworthy by the addition of the ill-conceived shelter and as a result of her unseaworthiness capsized and foundered with the loss of all aboard. Having in mind her last known position, her unseaworthy condition, her failure to make any subsequent radio-telephone transmissions despite the fact that her engines and all her equipment were in good condition when she left the Kelley shipyard and, finally, having in mind that this was a northwesterly storm, I find that the MIDNIGHT SUN went down while at a distance substantially in excess of twenty miles east of Nantucket.

The petition for limitation of or exoneration from liability is denied and the case will stand for a hearing on assessment of damages.