Petition of **RISDAL & ANDERSON, INC.** for Exoneration from or Limitation of Liability as Owner of the FISHING VESSEL MIDNIGHT SUN.

No. 63–26.

United States District Court
D. Massachusetts.

Oct. 18, 1968.

See also, D.C., 266 F.Supp. 157.

James A. Whipple, Kneeland, Splane & Kydd, Boston, Mass., for petitioner.

George J. Dodd, Boston, Mass., for claimants, Irene Munford and Sam Lund.

John O. Parker, Boston, Mass., for Norwegian Consul.

Nathan Greenberg, Boston, Mass., for claimant, Veronica Humes.

Kline & Gardner, Gloucester, Mass., for claimant, Geraldine T. Wagner.

Barnet & Barnet, New Bedford, Mass., for claimant David S. Barnet.

## OPINION

GARRITY, District Judge.

This case arises out of the loss at sea with all hands on board of the commercial fishing vessel MIDNIGHT SUN on November 14, 1962. The MIDNIGHT SUN was owned by Risdal & Anderson, Inc., which filed a petition for exoneration from or limitation of liability with respect to the loss of the vessel. Personal representatives of each of the deceased crew members filed answers challenging the petition of Risdal & Anderson, Inc. and claims asserting that the petitioner was liable for all provable damages, under the provisions of the Jones Act, 46 U.S.C. § 688, and the Death on the High Seas Act, 46 U.S.C. § 761 et seq. The petition for exoneration from or limitation of liability was heard by Caffrey, J. and was denied upon the court's finding that the negligence of the captain, imputable to the petitioner, was the proximate cause of the loss of the vessel and that the vessel was unseaworthy. The case was ordered to stand for hearing on assessment of damages. Petition of Risdal & Anderson, Inc., D.Mass., 1966, 248 F. Supp. 928.

Since a majority of the statutory beneficiaries of the decedents were residents of Norway, letters rogatory issued on motions of Risdal & Anderson, Inc. and several claimants. Depositions of the Norwegian beneficiaries and other witnesses were taken in Norway and admitted in evidence at a hearing.

In reaching the separate findings relating to each claimant, the court has been guided by the following principles of law of general applicability.

(1) The personal representatives of the claimants herein are entitled to recover under either the Jones Act, 46 U.S.C. § 688, which provides jurisdiction "in case of the death of any seaman as a result of any such personal injury [suffered 'in the course of his employment']"; or the Death on the High Seas Act, 46 U.S.C. § 761, which provides jurisdiction "whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State * * *."[1]

(2) The relationship between the Jones Act and the Death on the High Seas Act is not simply one of alternative remedies, but rather the Death on the High Seas Act provides a remedy for an additional class of beneficiaries. The Four Sisters, D.Mass., 1947, 75 F.Supp. 399, 400–401. The Jones Act, 46 U.S.C. § 688, incorporating the Federal Employers' Liability Act, 45 U.S.C. § 51, provides for recovery "for the benefit of the surviving widow or husband and children * * * and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, * * *." Suit under the Death on the High Seas Act, 46 U.S.C. § 761, is "for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative * *." Thus a surviving spouse, parent or child of a decedent need not show dependency upon the decedent for recovery under either Act. The only claimants who must prove dependency are "next of kin" and "relative(s)."

(3) The claimants of the decedent alien seamen have the same rights

1. Judge Caffrey found that the MIDNIGHT SUN "went down while at a distance substantially in excess of twenty miles east of Nantucket." Petition of Risdal & Anderson, supra, at p. 932.

under both the Jones Act and the Death on the High Seas Act as they would have if their decedents were citizens of the United States, since Risdal & Anderson, Inc., is a United States corporation and the MIDNIGHT SUN was registered in the United States and flew the American flag. See Lauritzen v. Larsen, 1953, 345 U.S. 571, 585, 73 S.Ct. 921, 97 L.Ed. 1254; Gilmore and Black, The Law of Admiralty, 1957 ed., § 6–64, p. 388.

■■ (4) The measure of recovery for the claimants is the same under both Acts—pecuniary loss sustained by the beneficiaries. This measure of recovery is established under the Death on the High Seas Act by statute, 46 U.S.C. § 762, and under the Jones Act by a long line of cases, e. g., Grantham v. Quinn Menhaden Fisheries, 4 Cir., 1965, 344 F. 2d 590. Although the measure of recovery is well settled, by its very nature the amount of money that a beneficiary might reasonably have expected to receive if the decedent had lived cannot be determined with perfect accuracy. "Insistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience." Whitaker v. Blidberg Rothchild Company, 4 Cir., 1961, 296 F.2d 554, 555.

■ (5) The basic questions to be considered in each case are how much money would the decedent have had available for contribution to his beneficiaries and how much of that amount would he have contributed to them. Of primary importance is decedent's earning capacity, which may be estimated from such factors as decedent's actual earnings during the period before his death, his health, diligence and work habits in general, his prospects for advancement, and the economic conditions of the industry in which he was employed. Petition of Marina Mercante

Nicaraguense, S.A., S.D.N.Y., 1965, 248 F.Supp. 15, 26–27, aff'd 364 F.2d 118. Earning capacity is obviously related to life expectancy and work expectancy. As stated by Judge Day in Petition of Gulf Oil Corporation, D.R.I., 1963, 221 F.Supp. 1000, 1002:

"Life expectancy is not synonymous with work expectancy. It is not to be presumed that the decedent would be able or disposed to follow his usual occupation until the hour of his death even though he continued to enjoy good health and live for the maximum period accorded by said mortality table."

In the instant case, the court has considered that the rigorous physical demands and hazards of commercial scallop fishing would compel a typical crew member, especially one domiciled in a foreign land, to retire at age 65. Except where stated, decedents' earning capacity has been calculated on that basis.[2] With further reference to lost earning capacity, decedents' earnings were derived from shares of the catch of scallops or other fish by the fishing vessels on which they worked. The MIDNIGHT SUN was less than three years old when she sank and was commanded by an experienced captain. Fishermen like the decedents customarily work on several vessels during their careers and the trend of earnings in the ports of Gloucester and New Bedford is an important consideration in estimating earning capacity. Considerable evidence was introduced of annual shares from 1961 to 1966 on vessels more or less comparable to the MIDNIGHT SUN. It reflected generally increasing earnings, with 1965 an unusually good year and 1966 an unusually poor one, and was consistent with the testimony of the port agent of the fishermen's union that since 1961 the trend of earnings has been upward. In view of this evidence the court has considered that, except where stated, a

2. Of course in some situations reliance upon work expectancy rather than life expectancy, which would be from 5 to 10 years longer, makes no difference, e. g., contributions lost by parents and nurture lost by children. In such situations, the life expectancy of the parent or duration of minority of the child usually limits the award.

decedent sailing on every trip of a vessel comparable to the MIDNIGHT SUN would have had a gross earning capacity as follows for the following past years:

| 1963 | $6,500 |
| 1964 | 7,000 |
| 1965 | 8,500 |
| 1966 | 5,000 |
| 1967 | 7,000 |
| 1968 | 7,000 |

and an average of $7,000 for future years. After deducting from decedent's expected earnings his estimated personal expenses and similar amounts [3] to determine the net amount available for his beneficiaries, many factors should be considered in arriving at how much he probably would have contributed to each beneficiary. Among these are the number of his dependents, the history of his generosity and past contributions and likely changes in the pattern of his contributions when the circumstances of his beneficiaries changed, e. g., parents' old age or retirement and children's college enrollment, military service or marriage.

 (6) Children suffer a pecuniary loss from the death of their father in addition to the loss of his support, gifts and similar financial contributions.[4] That loss is commonly identified as the loss of nurture and guidance. A child is not fairly compensated for the loss of a parent whose fitness has been shown, Michigan C. R. Co. v. Vreeland, 1913, 227 U.S. 59, 73, 33 S.Ct. 192, 57 L.Ed. 417, unless he is compensated for loss of nurture because the "guidance of a parent in matters material, moral and spiritual is of a definite practical and financial value and is subject to pecuniary estimate." Moore McCormack Lines, Inc. v. Richardson, 2 Cir., 1961, 295 F.2d 583, 593 n. 9a, 96 A.L.R.2d 1085. In determining the pecuniary value of the loss of a decedent's nurture, consideration should be given to such factors as the education and character of the decedent and the time and attention he devoted to his children when he was alive. Rogow v. United States, S.D. N.Y., 1959, 173 F.Supp. 547, 561–562; Thomas v. Conemaugh Black Lick Railroad, W.D.Pa., 1955, 133 F.Supp. 533, 543. The prospects and character of the child should also be considered. If, for example, it is likely that a child will go away to college, as in Meehan v. Central Railroad Company of New Jersey, supra, 181 F.Supp. n. 4, at 622, loss of nurture may extend only until college age.

 (7) A further item of pecuniary loss which the beneficiaries may receive is an allowance for loss for delay in the form of pre-judgment interest on sums past due. In admiralty, such an award is discretionary. See Moore McCormack Lines v. Amirault, 1 Cir., 1953, 202 F.2d 893, 897–898. In computing damages the court has followed the approach approved in Moore McCormack Lines, Inc. v. Richardson, supra, at 595, including use of a 4% rate rather than the full legal rate because the prolongation of the case has been caused not by the petitioner but by the nature of the proceedings and the claims. Applying the principle that interest on sums past due will run from the several dates at which they would have accrued, the court has allowed 12% interest on the past due portion of awards extending beyond the date of judgment as an average rate of interest, having in mind (a) that there are no great discrepancies in amounts due particular claimants for various past

---

3. No deduction for income taxes should be made from the anticipated earnings of the type of decedent involved in this case. Petition of Marina Mercante Nicaraguense, S.A., supra, 248 F.Supp. at 125.

4. Widows may also receive additional compensation in some cases for the loss of their husbands' care, advice, household services, and the like. See Petition of Oskar Tiedemann and Company, D.Del., 1964, 236 F.Supp. 895, 907; Meehan v. Central Railroad Company of New Jersey, S.D.N.Y., 1960, 181 F.Supp. 594, 623.

years, and (b) that contributions and nurture due in 1962 would have earned interest of 24% and those due in each succeeding year 4% less. Where awards cover periods of less than six past years, correspondingly higher pre-judgment interest has been allowed, e. g., an award for four years ending November 1966 has been increased by pre-judgment interest of 18%. The petitioner has objected to allowance of pre-judgment interest, especially as to loss of nurture and the $1,500 awards for pain and suffering which it contends are recoverable only under the Jones Act which, it says, precludes recovery of pre-judgment interest. As for loss of nurture, this may be recovered under the Death on the High Seas Act, Moore McCormack Lines, Inc. v. Richardson, supra, at 590. As for the decedents' pain and suffering, it is true that a cause of action does not lie under the death statute, 46 U.S.C. § 761. Brown v. Anderson-Nichols & Co., Inc., D.Mass., 1962, 203 F.Supp. 489, and may be asserted only under the Jones Act. But the claimants in the instant case are proceeding under both statutes and the court considers that the claims for pre-judgment interest of each representative of a decedent should be treated as a unit. Recent decisions have permitted pre-judgment interest in a Jones Act case, Gardner v. National Bank Carriers, Inc., 4 Cir., 1964, 333 F.2d 676, and upon claims in admiralty for pain and suffering, Petition of City of New York, 2 Cir., 1964, 332 F.2d 1006, 1008.

(8) Damages for future losses of contributions and nurture have of course been commuted to present value. A discount rate of 4% has been employed partly because the same rate has been used in calculating loss for delay although higher interest rates have prevailed during the last few years, and principally because the decedents' beneficiaries are unsophisticated persons who may be expected to achieve minimum returns on their investments.

(9) The Norwegian monetary unit is the kroner. The rate of exchange has remained constant since 1962 at one kroner equal to 14 American cents, or about 7.15 kroners to an American dollar. Where testimony concerned payments and obligations in terms of kroner, this rate of exchange has been applied by the court.

(10) Whether or not an award should be made for the decedent's conscious pain and suffering depends upon the following findings of fact contained in the opinion of Caffrey, J., Petition of Risdal & Anderson, Inc., supra. There is no direct evidence regarding the demise of the decedents since the MIDNIGHT SUN "has not been seen or heard from since [about 2:00 P.M., November 14, 1962], nor has any wreckage from her ever been found." Witnesses from other fishing vessels in the area testified that the storm in which the MIDNIGHT SUN was lost was "as severe as they had ever experienced." The negligent construction and maintenance of the MIDNIGHT SUN "created a condition aboard the MIDNIGHT SUN under which in heavy seas she had a tendency to trap substantial quantities of sea-water in this plywood shelter"; "in heavy seas water was trapped on the deck" and "water [was] likely to collect in these open dories in heavy seas." The court concluded "that it is more likely so than not so that the MIDNIGHT SUN was lost during this storm because she was rendered unseaworthy by the addition of the ill-conceived shelter and as a result of her unseaworthiness capsized and floundered with the loss of all aboard." This court, of course, cannot find with certainty that each of the decedents experienced a specific amount of conscious physical or mental pain and suffering. Nevertheless, without presenting a parade of the horribles that probably confronted the decedents, the court finds that the most reasonable inference to be drawn from the above findings is that the decedents did experience a considerable amount of conscious mental and physical pain and suffering during and after the sinking and that an award of $1,500 should be allowed for each decedent. See Peti-

tion of Marina Mercante Nicaraguense, *supra*, 248 F.Supp. at 28 and cases cited in n. 34.

(11) In the summer of 1966, two attorneys for claimants and the attorney for the petitioner went to Norway and took the depositions of several decedents' relatives and other witnesses such as the local doctor and sheriff. The depositions showed that the cost of living in Norway in 1966 was considerably less than that in the United States. A person living alone required kr. 10,000–12,-000 annually to maintain a modest standard of living. A family of four, including two small children, spent kr. 8,000–9,000 annually for food. Electricity cost kr. 56 quarterly, more in winter. Coke and wood cost kr. 20 weekly during winter. Other indications of cost of living in Norway appear in findings relating to particular claims. They are relevant to all claims for lost contributions on behalf of Norwegian residents in that they bear upon the size of contributions which would probably have been made by the decedents to relatives living in Norway. Since their needs in terms of dollars would be considerably less than those of residents of the United States, the decedents' probable contributions to them would be correspondingly less than if they were living in this country. On the other hand, a decedent living alone in this country and aboard a fishing vessel most of the time would of course be able to send home a much larger portion of his earnings than if he had dependents here.

The court's findings respecting the claims of the representatives of the various decedents follow in alphabetical order of the decedents. All ages stated without qualification are as of November 14, 1962.

### Jens Ferkingstad

Jens Ferkingstad, age 46 and unmarried, was one of two brothers lost on the MIDNIGHT SUN. He was survived by his parents in Norway, both 76 years of age. Jens was the dutiful son who often made gifts of money, clothing and furniture to them, but they were not financially dependent upon him for support, although they relied upon him for support in their declining years should they need it. The father had worked in the United States until 1956 and was receiving a pension of $1,836 from America. The couple were receiving a Norwegian old age pension of kr. 6,000. They owned a small farm and received kr. 135 per year for haying. They had five children other than Jens and Olav, one of whom was an unmarried son who lived with them. Jens' contributions to his parents in cash averaged $100 annually and in goods about the same amount. The father had heart trouble and high blood pressure; the mother, abdominal trouble. Their life expectancies were seven and nine years respectively. Awarded $3,500, comprising $1,860 for pain and suffering,[5] $740 for the benefit of the father and $900 for the benefit of the mother.

### Olav Ferkingstad

Olav Ferkingstad, 12 years younger than his brother Jens, was 34. He had come to the United States about 1959 but had never sent contributions or gifts to his parents and no claim on their behalf has been asserted. The decedent's representative has, however, claimed on behalf of an alleged illegitimate child of the decedent. By memorandum filed March 31, 1967 the court ruled that an illegitimate child qualifies as a beneficiary under both the Jones Act and Death on the High Seas Act. The child's mother was married at the time of his birth on November 4, 1961 and the birth certificate names the mother's then husband as the father. Petitioner, in contesting the claim of paternity, has relied upon the birth certificate, see Mass. G.L. c. 46, § 19, and the presumption that a child born in wedlock is legitimate. There being no clear precedents in the law of the sea,

---

5. The same amount for pain and suffering is included in all other awards, but usually without specific reference.

the court has looked to state law, Igneri v. Cie. de Transports Oceaniques, 2 Cir., 1963, 323 F.2d 257, 259, with respect to the consequences of the presumption of legitimacy and the burden upon one seeking to overcome it. The presumption cannot be overcome "except on facts which prove, beyond all reasonable doubt, that the husband could not have been the father." Phillips v. Allen, 1861, 2 Allen, 453, 454. Commonwealth v. Kitchen, 1937, 299 Mass. 7, 8–9, 11 N.E.2d 482. The court finds that the claimant has proved such facts and established the decedent's paternity. The mother left her husband four years before the child's birth and lived with the decedent in Massachusetts for three years before the decedent's death; the mother did not live with her then husband, who divorced her in 1967, after 1957 and they had no children; the decedent reported the child as a dependent on his 1961 federal income tax return and deducted hospital and medical expenses incident to the child's birth; the decedent's family in Norway knew he had a son about one year old and thought he was married; the decedent was photographed holding and playing with the child in fatherly poses.[6] A father of an illegitimate child is required by Massachusetts law to contribute reasonably to its support and maintenance during its minority. Mass.G.L. c. 273, § 15. As previously explained, that is not the sole test. Michigan Central R. Co. v. Vreeland, supra, 227 U.S. at 70, 33 S.Ct. 192. The claimant is entitled to such contributions as the beneficiary had "reasonable expectation" of receiving from the decedent. In deciding upon the amount of the award, the court has considered among other things the child's mother's testimony that the decedent was a hard worker and healthy and loved the child very much; and decedent's earnings approximating $6,000 in 1961 and $5,-000 in 1960. On the other hand, the decedent had not been adjudicated the father; it is by no means certain that he would have married the mother, who had had three husbands before she started living with the decedent and now has a fourth who is supporting the boy; nothing prevented him from returning to Norway, where most of his relatives lived, and defaulting on his moral and legal obligations in the United States; he had never sent money or gifts to his parents in Norway. The decedent's representative has also asserted a claim for loss of nurture, which the court denies. Awarded $8,000.

*Torgils Holmen*

Holmen, age 42, was a licensed ship master. He was unmarried but survived in Norway by an illegitimate son 8 years old whom he was ordered to support until age 18 by order of a Norwegian court. The rate of support was fixed by local Welfare Department regulations. Originally it was kr. 50 monthly, then kr. 60, and since July 1961, kr. 75. It is likely that it would be increased further. Holmen was concerned for his son's welfare. He deposited funds in advance in Norway from which support payments were made and, on two occasions, sent parcels of clothing to him from the United States. Holmen probably would have sent some money to him after he had reached age 18. No claim for loss of nurture has been asserted; nor could one lie. Claim was made for the benefit of a sister, but no dependency was shown. Awarded $4,000.

*Gordon Kallestein*

Kallestein, age 23, was unmarried and was survived by his father, 50, mother, 48, and three brothers and three sisters. One married brother and one married sister lived in the United States; all others were single and lived

6. At the trial the mother was permitted, over petitioner's objection, to testify as to nonaccess of her then husband, the court reserving decision on the admissibility of this testimony. The petitioner's objection is sustained under the Lord Mansfield rule. Sayles v. Sayles, 1948, 323 Mass. 66, 69, 80 N.E.2d 21, 4 A.L.R. 2d 564.

in Norway at home with their parents, where they were close to completing their educations. Kallestein was a hard worker who had come to the United States four years before the tragedy and had sent home approximately $1,500. He had returned home for six months in 1960 and had intended to return again about Christmas, 1962 and buy his parents' small farm and develop and operate it. His parents would live there with him. The parents were deriving income of about kr. 3,500 annually from the farm; the father worked as secretary to a mission which paid kr. 18,000 per year. The parents were not dependent upon their children in 1962. However, the father had heart trouble and his capacity for work was decreasing and the mother had a cancer for which she was operated on in 1965. Their life expectancies of 23 and 30 years respectively should be reduced somewhat in view of their illnesses. On the other hand, their reliance upon their children would be greater than if they were to enjoy good health. In this instance, the decedent's lost earning capacity has been considered not on the basis of his working as a fisherman but as a farmer in Norway operating a farm which his father thought might be developed to yield income of between kr. 20,000 and kr. 30,000 annually. The other children would also probably make contributions to their parents. The decedent would probably feed and house them and, to a considerable degree, care for them. His attending and caring for them would also be of pecuniary value to them. Awarded $12,000, of which $5,140 is for the benefit of the father and $5,000 for the benefit of the mother.

### August Larsen

 Larsen, age 54, had come to the United States in the early 1920's. He was unmarried and survived by his father, who died two years later at age 89. In 1945 or 1946 when in Norway as an American soldier, he gave his father kr. 1,500 but never sent any money from the United States and only an occasional letter. His step-mother, about 73, also survived, but no claim was made for her benefit until after the hearing; and the decedent never sent her any funds. In view of the decedent's age, the court does not consider her a parent within the meaning of the statute. Three brothers living in Norway also survived the decedent. The court finds that none of the decedent's survivors suffered a pecuniary loss by reason of his death. Awarded $1,860.

### Arne Lindanger

 Lindanger, 53, was survived by his widow, 48, who lived in Norway and was entirely dependent upon him. He had come to the United States in 1952 and had visited the home he and his wife owned in Norway in 1954 and 1958. He was a decent, hard-working man of sober habits but had been troubled by a bad back after his last return to the New Bedford fishing fleet and his earnings were less than in previous years. The fatal trip with the MID-NIGHT SUN was the first he had taken after having been ashore for a considerable period of time. He was trying unsuccessfully to save money with which to return to Norway where he would be employed as a fisherman earning about kr. 17,000 annually. Before coming to the United States, he had owned his own boat, a large open motorboat, and was a good fisherman. He sent money regularly to his wife, averaging kr. 10,000 annually. He had a married son, also a seaman, and two married daughters to whom he made occasional gifts and who are in no position to support his widow. No claim is made on their behalf. The decedent's widow is sickly and unable to work. The decedent's work expectancy was 12 years, assuming retirement at age 65, and life expectancy 20 years. Because of his character and wife's frailty, the court has considered that Lindanger would probably have worked a few years beyond age 65, despite his back trouble, which appeared to be lessening. The decedent's representative also claimed an allowance for care, counsel and

guidance to the widow, but there was insufficient evidence to warrant an award of that nature. See Petition of Oskar Tiedemann and Company, supra, n. 4. Awarded $24,000.

### Sam Lund

■ Lund was 57. His elderly mother died in Norway in April 1964 and a dependent sister in Norway married December 21, 1963. He sent them a total of approximately $1,000 annually. Awarded $3,400.

### Jan Nilsen

■ Nilsen, age 18, was survived by his widowed mother in Norway, age 48, who had a life expectancy of 30 years. He had come to New Bedford in August 1962 and had already sent her $150. Previously he had worked in Norway and had been at sea and had made regular contributions. He was a hard worker and a dutiful son. She also had four older, married sons, two of whom live in Fairhaven, Massachusetts, all except one with children of their own. She was employed as a cannery worker and, in 1965, had an income of kr. 4,400, but her health varied and she suffered from sciatica. She visited her married sons in Fairhaven twice, once in 1955 and once in 1963. In all probability, Nilsen would have married and had children; and his older brothers would have helped support their mother. But he was the only one who contributed to her regularly and would in all probability have continued to do so for as long as she lived. Awarded $14,000.

### Asbjorn Pedersen

■ Pedersen, age 45, had been divorced in 1948, at which time he was ordered to pay $50 monthly for the support of his only child, a daughter who lived in California with her mother and was married at age 17 on December 24, 1962. There was no evidence that the decedent made any contributions to his daughter beyond the amount ordered, if in fact he paid that, or that he ever saw or communicated with her. Awarded $2,000.

### John Wagner

■ Wagner, 36, was a native of Gloucester and the only member of the crew with no ties to Norway. In April 1962 his wife had divorced him for cruel and abusive treatment and no claim has been asserted on her behalf. He was survived by six children Cheryl 14, John 12, Theresa 11, James 7, Jeffrey 4 and Christopher 1, on whose behalf claims have been made for loss of support and nurture. The decedent had separated from his wife in May 1961, two months before their youngest child was born, and made no direct contributions to the support of his family after June 1, 1961 when his former wife commenced receiving aid from the Gloucester Welfare Department, which tried to collect money from him. In connection with the divorce proceeding, the court had ordered him to pay $30 weekly towards the support of his former wife and children. The Department had been unable to locate him at times but had collected $887 from him during the 16-month period from June 1961 to his death in November 1962. At that time, the welfare payments were at the rate of $280 per month. During the 1950's the decedent's earnings as a fisherman averaged about $3,000 annually. His best year was 1959 when he earned $5,260. He was injured during the first week of 1960 and was out of work for ten months but was in good health in November 1962. He worked for the Gloucester Housing Authority during the first six months of 1961, earning $83 per week. He left that job in June 1961, shortly after leaving his family, and nothing definite is known about his employment thereafter. He may have been on two or three fishing trips sailing from Gloucester before the fatal voyage from New Bedford. After June 1961 he made occasional contributions to the family, e. g., clothing for the children, a linoleum for the kitchen floor, and continued to give toys and other presents to the children.

The decedent left school at an early age. His marriage was a stormy one,

due principally to his drinking, which also brought about the loss of his job at the Housing Authority. He had a criminal record, mostly for nonsupport and drunkenness. But he was not an alcoholic and had periods of sobriety extending many months. Previous to the separation, the decedent spent much of his spare time with his children teaching them sports and skills and taking them on picnics and to the beach. Himself poorly educated and not a churchgoer, he insisted that they study their lessons and attend church. After the separation, he continued to visit them. The day before his last voyage, he telephoned his former wife and made a date with her to go Christmas shopping for the children upon his return.

Regarding the claim for loss of support, there is a question whether the children lost anything, inasmuch as their mother was receiving aid to dependent children at the rate of $3,360 annually and the decedent's payments to the Welfare Department were less than one-fourth that amount. On the other hand, the decedent's earnings probably would have increased over the years at least to a point where he could and would comply with the support order of the Probate Court that he pay $30 weekly for the support of his family and perhaps pay the arrearages owed to the Welfare Department. He once served three months in jail for nonsupport and presumably would want to avoid another jail term. The petitioner has suggested an approach which the court adopts with modifications. A practical allocation of the ordered $30 weekly payments is $12 for the former wife and $18 for the children. Until July 30, 1980, Christopher's 19th birthday, $18 weekly or $936 annually will be divided among the decedent's children under age 19, such that so long as six would have been dependent, each is allocated one-sixth or $3 weekly; while five, one-fifth or $3.60; while four, $4.50, etc.[7] Cheryl married on Sep-

tember 3, 1966, ten days before her 18th birthday, so that the other five childrens' awards are increased to $3.60 weekly one year earlier than if she had remained dependent until age 19.

The court rejects the claim for loss of nurture. No doubt there was genuine affection between the decedent and his older children and in happier times they benefited from his interest and companionship. But he moved away and his contact with them thereafter was limited to an occasional visit of a few hours' duration. To be of pecuniary value, nurture must involve control of a child and influence by good example. An occasional admonition or word of encouragement, however heartfelt, does not amount to nurture. Awarded $17,460, including for the benefit of Cheryl $700, John $1,300, Theresa $1,500, James $2,600, Jeffrey $3,700 and Christopher $5,800.

In addition to the several awards totalling $90,220, representatives of the decedents are awarded taxable costs, excluding travel and living expenses of counsel who attended the depositions in Norway.

---

7. Petitioner would limit the award to $3 weekly to each child until age 18, so that the total to the children as a group would be reduced by $3 weekly or $156 annually upon any child reaching age 18.