Petition of H. Leslie ATLASS For Exoneration from or Limitation of Liability as The Owner of a Certain Vessel Known as The YACHT SIS.

Catherine MUTH, Administratrix of the Estate of Clem Muth, deceased, and Mollie Darr, Administratrix of the Estate of Kurt Darr, deceased, Claimants-Appellants,

v.

Harriet M. ATLASS and Chicago Title and Trust Company, Executors of the Will of H. Leslie Atlass, Petitioners-Appellees and Cross-Appellants.

Nos. 14872, 14873.

United States Court of Appeals Seventh Circuit.

June 30, 1965.

Rehearing Denied Sept. 28, 1965.

Edward Raszus, Harold Liebenson, Chicago, Ill., for Mollie Darr, claimant-appellant.

Robert W. MacDonald, G. Kent Yowell, Chicago, Ill., for claimant-appellant Catherine Muth.

Edward B. Hayes, Warren C. Ingersoll, Lord, Bissell & Brook, Chicago, Ill., for petitioners-appellees and cross-appellants.

Before KILEY, SWYGERT and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This proceeding in Admiralty was initiated by H. Leslie Atlass as the owner of the yacht "Sis," under the Limitation of Liability Act (46 U.S.C.A. §§ 183–189) and Rules 51–54 of the Rules of Practice in Admiralty and Maritime Cases, for exoneration from or, in the alternative, limitation of liability under the Jones Act (46 U.S.C.A. § 688), for the death by drowning of two seamen, Clem Muth and Kurt Darr. Their representatives appeared as claimants and answered the petition. Subsequently, petitioner died and the executors of his estate were substituted as parties. (In this opinion we shall use the term "petitioner" rather than the names of his substituted parties.)

The District Court, after a lengthy trial without a jury, made extensive findings of fact and entered its conclusions of law. It concluded among other things that Atlass as an employer was liable for the deaths of the two seaman-employees which allegedly were proximately caused by the employer's failure to provide a safe means of ingress to and egress from the vessel. The Court also concluded that Muth and Darr were in part responsible for their deaths by reason of their own negligence. The Court, therefore, in summary held that petitioner was not entitled to exoneration but to a limitation of liability. In other words, it concluded there was negligence on the part of Atlass and contributory negligence on the part of Muth and Darr. Based on these conclusions an award of damages was made to the representative of each of claimants' estates.

From the Court's conclusion, embodied in its judgment, that petitioner was entitled to a limitation of liability, claimants appeal. From its conclusion, also embodied in its judgment, denying exoneration to petitioner, the latter cross-appeals.

■ While perhaps evident, we think it pertinent to note that if petitioner was entitled to exoneration, the issue as to limitation of liability is of no consequence. As the Court stated in The 84–H, 296 F. 427, 431 (C.A. 2):

"The whole doctrine of limitations of liability presupposes that a liability exists which is to be limited. If no liability exists there is nothing to limit. And in a proceeding to limit liability two duties are imposed upon the court. The first is to ascertain whether any liability exists. If it is found to exist the second duty arises, which is to ascertain whether the loss or damage was occasioned or incurred without the 'privity or knowledge' of the owner of the ship. If no liability is found to exist, the absence of all liability is to be decreed, and there the matter ends."

To the same effect see Rautbord v. Ehmann, 190 F.2d 533, 537 (C.A. 7).

It appears appropriate in the beginning to make a brief summary of the pleadings. The petition among other things alleged that petitioner was the owner of a certain vessel of the United States known as the yacht "Sis," of the registered dimensions of 101.5 feet in

length, 19.2 feet in breadth and 11.1 feet in depth, and of 131 gross and 89 net registered tonnage, with home port at Chicago, Illinois, and that at about 3 a. m. on October 26, 1956, while the "Sis" was within the Admiralty and Maritime jurisdiction of the United States, upon a certain drydock in the harbor at Detroit, Michigan, Clem Muth and Kurt Darr dropped or jumped into open water in a gap between the shipyard dock and the drydock, and drowned, while apparently returning to the yacht after spending the evening and early morning ashore.

The petition alleged that petitioner at all times exercised due diligence to make the vessel seaworthy and in all respects fit for the uses and purposes for which she was used; that the deaths of the said Muth and Darr were in nowise caused by the fault of the "Sis" or the persons in charge of her, or of petitioner or any other person for whose fault or neglect petitioner might be responsible, but was the direct and immediate result of the fault of Muth and Darr, or the result of inevitable accident. The petition further alleged that Catherine Eleanor Muth as administratrix of the estate of Clem Muth had brought an action in the District Court against petitioner, claiming damages under the Jones Act (46 U.S.C.A. § 688) in the amount of $250,000.00, and that petitioner had reason to believe that the personal representative of Kurt Darr, deceased, would commence an action against petitioner arising out of the same casualty.

The representatives of Muth and Darr (claimants) answered the petition, denying its material allegations. Muth's answer alleged that the death of Clem Muth was the immediate and proximate result of the negligence and careless acts of petitioner, his agents, servants, workmen and employees, occasioned and incurred with the fault, privity and knowledge of petitioner in carelessly permitting certain unsafe and dangerous conditions to prevail, in failing to provide safe and proper equipment on said vessel and in failing to take reasonable precautions

to provide safe working conditions. Among the acts of negligence alleged were that petitioner "Negligently failed to provide a reasonably safe place to work, a safe means of ingress to and egress from the vessel, a gangplank or other safe means of leaving or boarding the vessel, adequate and proper illumination or light in the boarding area." (Other acts alleged appear to be embodied in those stated.)

Darr's answer was substantially the same as that of Muth, alleging that his death was caused by the negligence of petitioner, his agents and servants.

We shall first make an abbreviated statement of the facts as found by the District Court. On October 18, 1956, the yacht "Sis" left Belmont Harbor in Chicago, bound for Florida. Among those aboard were H. Leslie Atlass, vice president of CBS in charge of its Chicago office, the registered owner of the yacht; Muth and Darr; Frank E. Johnson, a purchasing agent employed by CBS; Raymond Mendel, acting first mate, employed by Atlass; Robert L. Smith, engineer of the yacht, employed by Atlass, and John Wasilas, a painter employed by CBS.

On October 22, 1956, after having been stranded in the St. Clair River for two days, the yacht proceeded under her own power to the Detroit Basin, Inc., a shipyard in the Detroit River. On October 23, she was there placed on a marine rail and lifted out of the water to facilitate an inspection for damages, if any, resulting from the grounding. The yacht remained on the marine rail until after Muth and Darr drowned.

The marine rail was 101′ long and 34′ wide. Along the north (or inshore) end, it was level with the dock and there was a place 10′ wide to walk onto the marine rail bed without stepping across any gap. The yacht faced north in its position on the marine rail. On the eastern edge of the rail bed there were eight stanchions lined in a north-south row 13′ apart. The base of each stanchion was 15″ wide. Between the second and third, and also between the seventh and eighth, stan-

chions, from the north, there were steel crosspieces, each an inch in diameter, which crossed at a height of 5½′.

Immediately east of the eastern edge of the rail bed was a 32″ gap, below which there was water. At a point opposite the mid-point between the first and second stanchions (from the north) the water was 10 to 15′ deep. Immediately east of the eastern edge of the rail bed, after the gap, was a walkway about 5′ wide which extended north and south for a distance of 65′. The level of this walkway was approximately 2″ below the rail bed. Preparatory to doing repair work on the yacht, scaffolding was erected by the shipyard company on the starboard side and at her bow. While the yacht was on the marine rail, toilet and cooking facilities on board could not be used. Members of the crew slept on the yacht, although Johnson and Darr occasionally stayed on shore in a hotel.

Two means of ingress and egress were available, (1) a ladder between the rail bed and the gangway on the starboard side slightly forward of midship, which necessitated stepping across the gap, and (2) the north end of the rail bed which abutted the dock where there was no gap (inshore route). Abutting the east edge of the walkway was a boat shed, the west wall of which was 24′ high, all glass except for a 4′ concrete base. Inside the shed there were two north-south rows of ceiling light fixtures, four fixtures to a row.

While the yacht was on the marine rail or before, Atlass (petitioner) was joined by his son, Atlass, Jr., and his daughter, Harriet. On the morning of October 24, Atlass and members of his family left for Chicago, leaving Johnson in charge. Atlass was not again present at the yacht until after the fatal occurrence.

We now come to the events of the night of October 25, which culminated in the fatalities at about 3 o'clock the following morning. At about 7 p.m. (after dark), Smith, Mendel, Johnson, Wasilas, Muth and Darr went ashore to eat. The group left by the route they had most frequently taken, going from the vessel gangway down the ladder on the marine rail platform and then stepping across the gap to the walkway. This was at a point about 50′ from the north end of the walkway where there was an entrance from the boat shed. The party could have used the inshore route that night, where it was not necessary to cross any water. Everyone, including Muth and Darr, had used the inshore route on previous occasions, both in daylight and dark. Mendel returned to the ship at about 8 p.m., and Wasilas at about 9 p. m.

After dinner, Johnson, Muth and Darr went to a movie, then to a tavern known as Garvin's Bar where they found Smith and took turns ordering rounds of drinks. Muth was drinking straight whiskey with beer chasers. The bar stopped serving drinks at 2 a. m., and shortly thereafter Muth, Darr and Smith left, having been in the tavern three hours. A few minutes later they appeared at the boat shed through which they must pass in returning to the yacht. Gildersleeve, who had been the night watchman for thirteen years, unlocked the shed, turned on the overhead lights and permitted the three men to pass through. Darr was attempting to hold Muth as they went through the door, three or four steps ahead of Smith. As they emerged on the walkway, Darr was holding Muth up. They could have gone straight ahead and reached the rail bed by the inshore route, but instead they turned left and started down the walkway. About 15′ from the door of the boat shed, Muth fell into the gap between the walkway and the marine rail platform. Darr jumped in right behind him. They both drowned. (There was no proof that Muth was attempting to cross the gap at that unusual point.)

While the degree of intoxication of Muth and Darr at the time of the fatal occurrence is highly important, we need not burden this opinion with a detailed recital of the testimony bearing thereon. The Court found:

"Muth and Darr were, in part, responsible by reason of their own negligence for their deaths. Both had

been drinking alcoholic beverages immediately prior to the drowning, Muth having consumed substantially more than Darr. Both men knew or had reason to know of the debris and other obstacles on the walkway, dock and rail bed, and of the gaps, differences in levels and poor lighting. Muth's negligence was a 50% factor in causing his death, while Darr's negligence was a 30% factor in causing his death."

This is a tepid finding insofar as it relates to the degree of their intoxication. The proof discloses beyond question that Muth, when he left the tavern and at the time he fell into the gap, was intoxicated to the extent that he was in a stupor, and Darr was in a staggering condition. Just outside the tavern, while Smith and Darr were attempting to hold Muth up, he fell on the curb and skinned his knees and the side of his head. Their demeanor after they were in the water, as subsequently shown, strongly corroborates the direct proof as to the helpless condition of one and the near-helpless condition of the other.

This perhaps is a pertinent point to make some observations as to the legal effect which the courts have given to the right of a seaman to recover under the Jones Act for maintenance and cure or for damages for injuries sustained, as are sought in the instant case. We find no Supreme Court case which has directly decided the point in an action for damages. However, Farrell v. United States et al., 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, throws some light on the issue and it is pertinent because it contrasts the rights of the seaman under the two forms of action which are sometimes confused. In that case, the seaman sought to recover on both theories. The trial court sustained his action for maintenance and cure but dismissed it for damages. The Court of Appeals affirmed, Farrell v. United States et al., 2 Cir., 167 F.2d 781. The Supreme Court, in affirming the Court of Appeals, referred to a previous opinion and stated (336 U.S. page 515, 69 S.Ct. page 709):

"In Aguilar v. Standard Oil Co., 318 U.S. 724, [63 S.Ct. 930, 932, 87 L.Ed. 1107], the Court pointed out that logically and historically the duty of maintenance and cure derives from a seaman's dependence on his ship, not from his individual deserts, and arises from his disability, not from anyone's fault. We there refused to look to the personal nature of the seaman's activity at the moment of injury to determine his right to award. Aside from *gross misconduct* or insubordination, what the seaman is doing and why and how he sustains injury does not affect his right to maintenance and cure, however *decisive it may be as to claims for indemnity or for damages for negligence.* [Italics supplied.]"

Thus, the Court indicates that gross misconduct, and we think the conduct of Muth and Darr must be so characterized, may be decisive in an action for damages based on negligence.

In Wiper v. Erie Sand Steamship Co., 2 Cir., 293 F.2d 491, the Court affirmed the dismissal of a Jones Act case brought on the theory that the shipowner was negligent in permitting the seaman to go ashore when he was in a drunken condition. In rejecting the theory, the Court stated (page 493):

"Whatever the 'parental' duty of a ship's captain may be, it surely does not require him to forcibly detain every crew member who has had a few drinks or who wishes to go ashore to do a bit of drinking for relaxation."

In Schlichter v. Port Arthur Towing Company, 5 Cir., 288 F.2d 801, in a damage action for the death of a seaman by drowning when he fell overboard, the Court sustained a judgment in favor of the vessel owner. The Court cited cases in support of the general rule that intoxication only mitigates damages but (page 803), "Of course, the result is different if the seaman's negligent intoxication is the sole cause of the injuries."

In Barlow v. Pan Atlantic S. S. Corp. et al., 2 Cir., 101 F.2d 697, the Court affirmed a judgment denying the right of a seaman to recover maintenance and cure because of injuries sustained as a result of falling from a ladder while intoxicated.

In The S.S. Berwindglen (Rawding v. Hooten), 1 Cir., 88 F.2d 125, the Court sustained a judgment denying a claim for maintenance and cure for injuries sustained in attempting while intoxicated to climb a ladder leading to the dock.

Another case to be noted because of its similarity of facts is Landy v. United States et al., D.C., 101 F.Supp. 486. The action in Admiralty was brought by decedent's representative to recover damages under the Jones Act for a seaman's death occasioned by injuries sustained when he fell from a ladder while attempting to board a vessel. The owner was charged with negligence in failing to provide a safe means of ingress by reason of the defective condition of the ladder. The Court found that the seaman became intoxicated while ashore and returned to the vessel in that condition. Notwithstanding the Court's finding that the ladder was defective as alleged, it dismissed the claim on the basis that the seaman fell solely because he was intoxicated.

Prior to a consideration of the findings which form the basis for the Court's judgment against Atlass, we refer to an issue of importance, that is, whether Muth and Darr at the time of their deaths were engaged "in the course of their employment," a prerequisite to the right to maintain an action under the Jones Act. The issue is further in the case because of claimants' contention that Johnson and Smith, with knowledge of the intoxicated condition of Muth and Darr, were negligent in permitting them to return to the yacht and that such negligence was imputable to Atlass.

In Braen v. Pfeifer Oil Transportation Co., Inc., 361 U.S. 129, 133, 80 S.Ct. 247, 250, 4 L.Ed.2d 191, the Court stated:

"Petitioner was acting 'in the course of his employment' at the time of the injury, for at that moment he was doing the work of his employer pursuant to his employer's orders."

Assuming that Muth and Darr were in the course of their employment while departing from the yacht for the purpose of obtaining their meals and returning thereto in the normal manner, it certainly is a far-fetched idea that they continued in such course when they took to themselves the liberty of spending three near-midnight hours in a tavern consuming intoxicating liquors. Neither do we think that such relationship was restored when they attempted to return to the yacht, one in a drunken stupor and the other badly intoxicated.

Claimants attempt to meet this problem with the argument that the intoxicated condition of Muth was evident to Atlass' agents Johnson and Smith; that such agents were negligent in permitting his return to the ship; that they were acting within the scope of their employment in so doing and that such negligence was imputable to Atlass. We think this argument is without merit. Pertinent to this point is the Court's finding:

"Early in the evening of October 25, 1956, Muth, Darr, Mendel, Smith and Wasilas, among others, were taken to dinner by Johnson. Thereafter, Mendel and Wasilas returned to the yacht. Smith went to a tavern called Garvin's Bar where he was joined later by Muth and Darr. The three men remained until shortly after 2 a. m., and during this period Muth and Darr consumed alcoholic beverages."

In the first place, there is no finding that Johnson had knowledge of the intoxicated condition of the two men. There is testimony that he went to the tavern with Muth and Darr, where they joined Smith and had some drinks. Later, time not disclosed, Johnson left the party and returned to his hotel. Thus, the most that is shown as to Johnson is that he knew they were in a tavern drinking intoxicating liquors. He did not accompany and had nothing to do with the return of

Muth and Darr to the ship. On what theory he could be found negligent is not discernible.

Assuming, without a finding, that Smith was negligent in accompanying and permitting Muth and Darr to return to the ship, such negligence could not be imputable to Atlass because Smith's activities, both affirmative and negative, were not within the scope of his employment. Certainly he was without authority and it was no part of his duties to protect drunk men in returning to the ship or to prevent them from so doing.

Claimants cite only one Federal case, McDonough v. Buckeye S.S. Co., D.C., 103 F.Supp. 473, affirmed 200 F.2d 558 (C.A. 6), in support of their theory that Atlass is liable because of the negligence of his agents in taking Muth and Darr to the ship, a place of asserted danger. A comparison of the facts of that case with those here demonstrates that it is of no benefit to claimants. There, the ship owner knew that it was a regular procedure on his ship for a seaman to get drunk ashore and to be brought back to his ship by others of his crew and, with that knowledge, the owner had acquiesced in the practice. In fact, the ship owner employed a guard at the gate who was charged with the duty of refusing admission to seamen returning in an intoxicated condition. The guard placed another employee in charge of the drunken sailor for the purpose of escorting him to the ship. Instead of discharging his responsibility, the other employee, midway on the journey, abandoned the intoxicated sailor, who later was found drowned. The Court under those circumstances properly held, we think, that the ship owner was responsible for the negligence of his employees who were acting under specific directions and thus undoubtedly in the course of their employment.

Any doubt as to the holding in Buckeye is dispelled by Robinson v. Northeastern Steamship Corp., 228 F.2d 679 (C.A. 2), in which an action for damages under the Jones Act was dismissed. The Court stated (page 681):

"There [referring to Buckeye] the shipowner was held liable for the death of a drunken seaman who was drowned, when returning from shore leave, through the negligence of a shipmate who had undertaken to assist him to the vessel. In that case in assisting his shipmate the negligent sailor was acting in accordance with a long-standing custom, which had been recognized and approved by the shipowner, and consequently he was considered as acting within the scope of his employment. In the case at bar there was no proof that Woods' actions were requested or authorized by the defendant or were in accord with a custom recognized by the defendant. Without such authorization Woods was not acting within the scope of his employment, and his negligence, if any, in performing his voluntary undertaking could not be imputed to the defendant even if successful performance would further the interests of the shipowner."

The Second Circuit, as late as 1963, in a Jones Act case approved of the decision in Robinson and reversed a judgment in favor of the claimant (a seaman). Trost v. American Hawaiian Steamship Co., 324 F.2d 225. As to Robinson the Court stated (page 228):

"Although willing to assume that the assisting seaman was negligent and that the plaintiff's decedent was killed while in the course of *his* employment, this court refused to hold the shipowner responsible. Rather, we held in Robinson that the particular act performed negligently, aiding an intoxicated seaman to return to his ship, was not within the scope of the negligent seaman's employment. [Citing cases.]"

Preliminary to a consideration of the findings relating to petitioner's negligence, it is pertinent to observe that there is no finding of negligence on the

part of any person except Muth and Darr. As to Atlass, the Court found:

"Atlass personally, who was in Chicago, was without responsibility for the hazardous condition of the walkway, dock and rail bed as it existed at the time of the drownings."

Taking this finding at its face value, it would appear to exonerate Atlass from all responsibility for the asserted negligent conditions existing at the time of the occurrence. It may be that the Court while finding that Atlass was not personally responsible thought he was liable because of negligence of others imputable to him. If such be the thinking, there was, as noted, no finding that Johnson, left in charge of the ship when Atlass returned to Chicago, was negligent, and there is no finding that any other employee or agent of Atlass was negligent. It seems that if petitioner is to be held liable on an imputable negligence theory, he is entitled to know by whose negligence and of what it consisted.

In considering the findings as they concern the issue of petitioner's negligence, we recognize, without the citation of authority, two well established principles of law, (1) that an employer has a duty to provide seamen in his employment with safe and seaworthy appliances and a safe place to work, including a safe adequately lighted means of ingress and egress to and from the vessel, and (2) that the burden of proof under the Jones Act to show negligence causally relating to the accident is on the seaman or his representative. Negligence is not presumed but must be affirmatively proved.

The findings as they relate to negligence, other than those already referred to, are:

"No. 27. Access to the rail bed from shore was hazardous, particularly at night, whether it was accomplished from the walkway, by stepping across the gap, or from the dock where it was flush with the rail. Part of the five foot width of the walkway was obstructed by timbers and planks. The east side of the rail

bed was made dangerous by the gap, the difference in its level as compared with that of the dock, and the presence of scaffolding, stanchions and cross bars; in addition, the rail bed was cluttered with ropes and planks. The north side of the rail bed, along part of which there was no gap, also was obstructed by scaffolding and littered with ropes and planks. The route most frequently taken from shore to the rail bed was along the walkway and across the gap."

"No. 39. Considering the debris and other obstacles on the walkway, dock and rail bed, and the hazards created by the gaps and differences of levels, the lighting of the walkway, dock and rail bed at the time of the drowning was insufficient."

As already noted, there is no finding or conclusion by the Court that the condition portrayed by these findings was due to the fault or negligence of Atlass, Johnson or any other employee; in fact, the Court found that Atlass was not personally responsible. The stanchions and cross-bars referred to were a part of the permanent rail bed structure. The shipyard company constructed the scaffolding preparatory to doing repair work on the yacht, and it was also responsible for the ropes and planks on the rail bed.

Assuming, absent a finding, that there was negligence on the part of petitioner's employees in permitting these so-called obstructions on the rail bed (west) side of the gap, they could not have contributed in whole or in part to the tragedy because Muth and Darr were on the walkway on the opposite (east) side of the gap when they fell or jumped into the water.

That portion of the findings that the walkway was obstructed by timbers, planks, debris and other obstacles is without substantial support. The only testimony we find in this respect is that there were some planks on the walkway, and the photographs offered by claimants show that they were piled in order in their usual place on the east side of the

walkway, against the wall of the boat shed. These planks were a part of the facilities furnished by the shipyard company for use by seamen if needed in bridging the gap between the walkway and the rail bed. They were never used by any of petitioner's seamen, including Muth and Darr, because their use was not thought necessary. In any event, the presence of these planks bore no relation to the occurrence. Muth and Darr made no attempt to return to the ship along the north side of the rail bed where there was no gap. When they left the boat shed accompanied by Smith, they turned left and proceeded south along the walkway, headed for the point across the gap from the ladder. As the Court found, this was the route most frequently taken from shore to the rail bed. There is no proof and no claim that there was any obstacle on the walkway which interfered in any manner with Muth and Darr as they proceeded along the walk on the east side of the gap.

The Court's finding that "the lighting of the walkway, * * * at the time of the drowning was insufficient" is of a conclusory nature, based upon the opinion testimony of claimants' expert witnesses. Petitioner's expert witness expressed his opinion that the illumination on the walk was sufficient for the purpose of its use. These witnesses seemed to be in substantial agreement that the illumination was equal to that furnished to pedestrians on Chicago streets. The proof by witnesses who had personal knowledge of the condition is overwhelming that the illumination was sufficient for normal and ordinary use. No amount of illumination could have saved Muth and Darr from their own folly. That could have been accomplished only by placing a cover over the gap from end to end.

Smith, the only eye witness, testified that the point of the occurrence was about midway between the entrance to the walkway and the ladder, which had been in the same place since the yacht had been on the rail bed. He stated that "the lighting was good enough you could see to get around in out there because it was shining right through the glass on the platform out here and the walkway"; that he had been with Muth and Darr on previous occasions when they were crossing the gap between the walkway and the rail bed, and that they had no difficulty in seeing. Milton Pinkstaff testified that he had been employed by the shipyard as a carpenter for some fourteen years, that the rail bed had remained in the same position during that time and that the gap was easy to step across. He arrived at the scene of the occurrence at about 3 a. m., and stated that there were no hoses, ropes or debris on the walkway, that the lights in the boathouse were on and that the lighting conditions were very good. Morton Gildersleeve testified that he had been employed by the Detroit Basin as a night watchman from 1948 to 1961, that when on duty he stepped across the gap two or three times each night and that during his employment no person other than Muth and Darr had fallen into the gap. He observed no debris of any kind on the walkway and stated that the lighting conditions were good. All members of the crew, including Muth and Darr, in daytime and at night, had stepped over the gap many times in leaving and returning to the yacht. Atlass' daughter testified that with her tight skirt and high heeled shoes it was an easy step. Raymond Mendel, a witness for claimants, testified, "There wasn't too much light that did come through them windows. It was like early evening, just between dark and evening, you know dusk." He admitted that flashlights were available on the yacht but were rarely needed. In a pre-trial statement, the witness said, "That was an easy step and I am sure everybody who was on the yacht and who I have mentioned, including Mr. Atlass' daughter, Sis, who was a girl in her teens, stepped across that gap without any trouble. I know that I saw Muth and Darr go onto the platform in both ways I have described."

The Court made no finding that insufficient lighting of the walkway was due to the negligence of Atlass or any of his employees or that it was the cause, in

whole or in part, for the fatal occurrence. We think there is no basis for a reasonable inference that it was. The misconduct of claimants' decedents was solely responsible for their unfortunate demise.

In Jackson v. Pittsburgh S. S. Co., 6 Cir., 131 F.2d 668, the Court affirmed a judgment denying to a seaman a claim for damages under the Jones Act. It was there alleged that the boat owner was negligent in his failure to furnish a ladder or any other means of ingress and egress. The seaman desired to go ashore, jumped from the deck of the vessel to the dock, a distance of about six feet and sustained the injuries complained of. The Court assumed that the owner was negligent in failing to provide a ladder but denied recovery because the misconduct of the seaman was the sole cause of his injuries. In doing so the Court stated (page 670):

"When a seaman, by his own volition, creates an extraneous circumstance, he brings about an intervening cause that directly affects his relation to his employers and to the ship. He is responsible for such intervening cause if it consists of his own wilful misconduct, is something which is done in pursuance of some private avocation or business, or grows out of relations unconnected with the service or is not the logical incident of duty in the service. [Citing cases.]"

See also Meintsma v. United States, 9 Cir., 164 F.2d 976, 977.

In conclusion, it seems in order to make a brief statement of the undisputed facts relative to the conduct of Muth and Darr after they were in the water. Smith who was unable to swim stepped to the gap, knelt down and directed his flashlight therein. He saw Darr trying to help Muth, but Muth was throwing his arms around and fighting Darr. Smith lay on the walkway with his left hand down into the gap about three or four feet. He braced himself with his right hand on the rail platform. Smith

shouted several times for them to grab hold of his hand, and if either had reached up he could have done so, but neither did. Gildersleeve, the night watchman, was at the scene in a few minutes and saw Smith dangling a rope, trying to get Muth to grab it, holding it right in front of Muth's face between his outstretched arms. The rope actually came in contact with Muth's head and body but he did not take hold of it. Gildersleeve placed a ladder in the water but Muth would not take hold.

Mendel and Wasilas were asleep on the boat when they heard cries for help. Both came to the platform and jumped into the water in an effort to save Muth and Darr. At that time the latter had disappeared. They tied a tight line around Muth's body and gave the end of it to Smith. They then swam underneath the dock into the boat shed and climbed out of the water. Smith held Muth out of the water until their return. When they attempted to pull him from the water, he slipped through the loop and was not seen again.

Muth and Darr were middle-aged men, healthy and vigorous, and both were swimmers. The conclusion is inescapable that their total inability to aid themselves or each other after they were in the water was the result of their intoxicated condition, induced by their own voluntary acts. In contrast, Mendel and Wasilas, who were sober, were in the water for some ten minutes and had no difficulty in swimming to safety.

In our judgment, and we so hold, the deaths of Muth and Darr were the result solely of their own gross misconduct. It follows that the Court erred in its refusal to exonerate Atlass of all liability for loss or damage occasioned thereby. In view of this conclusion, other issues discussed in the briefs need not be considered.

The judgment is reversed and the cause remanded for such further proceedings as are not inconsistent with this holding.