**Marjorie J. ABBOTT, Administratrix of the Estate of Joseph A. Abbott, Deceased, Appellant,**

v.

**UNITED STATES LINES, INC., Appellee.**

**No. 74–1319.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1974.

Decided March 11, 1975.

C. Arthur Rutter, Jr., Norfolk, Va. (Breit, Rutter, Montagna & Carter, Norfolk, Va., on brief), for appellant.

John B. King, Jr., Norfolk, Va. (Walter B. Martin, Jr., and Vandeventer, Black, Meredith & Martin, Norfolk Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and THOMSEN, District Judge.

BUTZNER, Circuit Judge:

The primary issue of this appeal is whether the maritime duty of rescue arises only after a ship's officers know with certainty that a member of the crew is missing. The district court ruled that until the officers actually ascertain that a man is missing, there is no duty to search the ship for him. Because the rescue doctrine is not so severely circumscribed, we reverse and remand for a new trial. We hold that if there is a reasonable possibility of rescue, a ship is under a duty to search and attempt a rescue when its officers know *or in the exercise of reasonable care should have known* that a crewman is missing.

Marjorie J. Abbott, Administratrix of the estate of her husband, Joseph A. Abbott, brought this action against United States Lines under the Jones Act and the Death on the High Seas Act to recover damages for his death. Abbott, a capable, experienced officer, was the chief engineer on the SS PIONEER CONTENDER, which was bound for Vietnam loaded with ammunition.

While the ship was on the high seas with no other vessel within forty miles, a broken pump caused the second assistant engineer, then on watch, to shut down all engines at approximately 5:00 a. m. He immediately called the bridge, and the duty officer notified the master, who promptly left his quarters and came to the bridge. The second assistant engineer also sent an oiler to tell chief engineer Abbott and the first assistant engineer of the trouble. The messenger woke up Abbott, who responded, "I will be right down" or "I will be down." In a few minutes, the first assistant engineer arrived in the engine room and quickly repaired the pump. The engines, which had been stopped for ten minutes, were started and gradually brought to full speed over the next thirty-five minutes. The master then left the bridge and returned to his quarters.

Although Abbott had acknowledged the oiler's call, he never appeared in the engine room. He was not called again, and no effort was made to determine his whereabouts or to report to him that repairs had been accomplished. When he did not come to breakfast at approximately 8:00 a. m., the chief mate commented that, aroused by noise in the engine room, he had looked in Abbott's cabin about 5:15 a. m. and had not seen him. Notified of this, the master immediately ordered a search of the ship. When it was apparent that Abbott was not aboard, the master reversed course at 8:30 a. m., placed lookouts, broadcast a "man overboard" message, and returned the vessel to the area where it had been located at approximately 5:00 a. m. The water temperature in this vicinity was above 80°. However, Ab-

bott was not sighted, so the vessel resumed its voyage to Vietnam at 1:00 p. m.

Mrs. Abbott presented the testimony of an experienced master to support her claim that the ship's officers, exercising due diligence, should have discovered that Abbott was missing shortly after five o'clock. This witness expressed the opinion that Abbott's absence from the engine room should have been noticed, that he should have been called again, that the master should have gotten in touch with him, and that if the ship had undertaken search and rescue efforts shortly after 5:00 a. m., there would have been a greater possibility of his survival. This expert was corroborated in part by the second assistant engineer, who stated that it was customary to get the chief engineer in any emergency that necessitated stopping the engines. He acknolwedged that he wondered why Abbott did not come to the engine room but simply assumed he had gone back to sleep.

The material facts about the broken pump, stopping the engines, notifying Abbott, his response and his failure to appear are not disputed. However, the shipowner introduced evidence about the significance of these facts in sharp conflict with the testimony of Mrs. Abbott's expert. The ship's master testified that it was not unusual for a chief engineer to stay in bed after being notified that the engines had been stopped on the high seas. He also said that he saw no reason to discuss the problem with the chief until a more convenient hour later in the day. He was corroborated by another experienced master, who testified that had he been captain of the ship, he would not have gotten up for such slight trouble.

At the conclusion of all the evidence, the district court in effect granted partial summary judgment and ruled that the events occurring before 8:00 a. m. disclosed no actionable negligence. Accordingly, the judge instructed the jury that in reaching their verdict they could consider only the conduct of the master and crew after they discovered Abbott's disappearance when he did not come to breakfast.

The humanitarian doctrine of maritime rescue was recognized in Harris v. Pennsylvania R.R. Co., 50 F.2d 866 (4th Cir. 1931), and in Cortes v. Baltimore Insular Line, 287 U.S. 367, 377, 53 S.Ct. 173, 176, 77 L.Ed. 368 (1932), where the Supreme Court said:

"There is little doubt that rescue is a duty when a sailor falls into the sea . . . and that a liability to respond in damages is cast upon the shipowners if he is abandoned to his fate."

The principles governing the doctrine have been stated authoritatively in Gardner v. National Bulk Carriers, Inc., 310 F.2d 284 (4th Cir. 1962). In that case the court held that the duty of search arises when there is a reasonable possibility of rescue, and if the duty is breached, the seaman's survivors need not show that he could have been saved.

The district judge believed that *Gardner* imposes a duty of rescue only when "the fact of the non-presence [of a seaman is] discovered." *Gardner,* however, does not expressly discuss this issue. In that case, a seaman was called to stand watch and could not be found. This, the decision implies, was sufficient under the circumstances to alert the master that the man might be missing and imposed a duty to search the ship and attempt a rescue.[1]

The rule of maritime rescue is not based on absolutes. In *Gardner* we noted that the doctrine does not require

---

1. The district judge also relied on Miller v. Farrell Lines, Inc., 247 F.2d 503 (2d Cir. 1957). However, in that case, the district judge did precisely what the district judge in the case now before us declined to do. He submitted to the jury the question of whether Miller's conduct before the discovery of his absence could reasonably have led the master or his officers to believe that he was in danger. The jury answered in the negative but paradoxically returned a verdict for Miller's representatives, which the court then set aside.

"that in every case immediately upon word of a seaman's absence from his watch all progress of the ship must be halted and the ship reversed for rescue operations while a search is made aboard. . . ." 310 F.2d at 288. On the other hand, *Gardner* does not suggest that the absence of a crew member from his station can be disregarded with impunity. Certain knowledge that a seaman is missing is not a prerequisite to the duty of search and rescue. The doctrine of maritime rescue is based on the law of negligence, and like other aspects of this law, responsibility is tested by the standard of reasonable care. *See* Prosser, The Law of Torts § 37 at 206 (4th ed. 1971); 2 Norris, The Law of Seamen § 690 (3rd ed. 1970). Applying this controlling principle, we hold that if there is a reasonable possibility of rescue, the ship is under a duty to search and attempt a rescue when its officers know *or in the exercise of reasonable care should have known* a crewman is missing.

Of course, we express no opinion about the outcome of this controversy. That is for the trier of fact, because fair-minded people may draw different inferences from the evidence. Schulz v. Pennsylvania R.R. Co., 350 U.S. 523, 527, 76 S.Ct. 608, 100 L.Ed. 668 (1956); Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946). If the jury believes the shipowner's testimony that Abbott's absence from the engine room was insufficient to alert a person of reasonable prudence to search for him, a verdict for the defendant would be justified. On the other hand, if the jury believes the testimony presented by Mrs. Abbott, they could decide that his absence was so unusual that due diligence dictated a search shortly after he failed to appear in the engine room. In this event, the ship breached its duty to Abbott and, as we ruled in Gardner v. National Bulk Carriers, Inc., 310 F.2d 284 (4th Cir. 1962), his representative can recover without proving that he was then alive and could have been saved by a reasonable rescue effort. *See* 2 Norris, The Law of Seamen § 693 (3rd ed. 1970);

Kelsey, Shipowner's Duty to Rescue Crewmen—The Gardner Case, 49 Va.L. Rev. 492 (1963).

We hold, therefore, that the district court should have submitted to the jury whether the failure to discover until after 8:00 a. m. that Abbott was missing was due to any negligence on the part of the shipowner's employees. We find no cause for reversal in the other assignments of error. The judgment of the district court is reversed, and this case is remanded for a new trial.