Stella REYES, Administratrix of the Estate of Florentino Reyes, Deceased, Plaintiff-Appellant,

v.

VANTAGE STEAMSHIP COMPANY, INC., et al., Defendants-Appellees.

No. 75–2696.

United States Court of Appeals, Fifth Circuit.

Jan. 2, 1980.

Rehearing Denied Feb. 14, 1980.

Frank E. Caton, Thomas B. Greene, III, Houston, Tex., for plaintiff-appellant.

James E. Ross, John L. Yates, Houston, Tex., for defendants-appellees.

## ON PETITION FOR REHEARING

(Opinion August 26, 1977, 5 Cir., 1977, 558 F.2d 238)

Before BROWN, HILL and FAY, Circuit Judges.

JOHN R. BROWN, Chief Circuit Judge:

We grant this rehearing in order to clear some confusion engendered by our opinion appearing at 558 F.2d 238, and to modify certain portions of that opinion. Our prior opinion directed the trial court to compare the negligence of seaman Reyes with that of this employer, and to award some positive amount of damages even if slight, to plaintiff Stella Reyes, widow of the deceased seaman. The effect of our opinion today is to add to the task of the trial court on remand: the court must determine the issues of causation for the two faults held, as well as comparative fault.

◼ A few additions to the facts stated in our prior opinion are appropriate. As stated, Reyes was legally drunk at the time

of his death [1] and the ship operated a floating dram shop, which sold large quantities of alcohol to the crew. The drunk seaman met his fate when he decided to take a swim in the ocean. He jumped some 35 feet off the side of the ship and attempted to swim to a mooring buoy located several hundred feet away. He was spotted almost immediately and crew members were aware from the time of first sighting that Reyes was in mortal danger. Yet no effort by either crew or officers was made to rescue Reyes, not even a shouted command for him to return to the vicinity of the ship.

By the time that a ship's officer was made aware that Reyes was in the water, Reyes had cleared the lee of the ship and was beyond reach of a hand-thrown line or life ring. At the same time, Reyes encountered a powerful current which began to sweep him away from both ship and mooring buoy. Careful examination of the record shows that (i) Reyes did not stop swimming or cry out for help, but (ii) he was in an obvious fight for his life with the current, and (iii) he was exerting enormous effort in his fight against the current. Reyes swam in this fashion for several minutes, slowly gaining on the current and approaching the buoy. Only about 20 feet short of the buoy, however, and for reasons unknown, Reyes became motionless in the water and at that point, or somewhat later, died.

■ Application of the maritime rescue doctrine is at issue here. The first branch of that doctrine is applicable where a seaman "has apparently fallen overboard but [his] presence or location in the water is not readily discernable from the ship." 1B R. Benedict, Admiralty § 30, at 3–225 (6th ed. 1976). That "search and rescue" branch requires the ship's officers to both rescue

the seaman *and* to effect a search of the area traversed by the ship, so long as it is reasonably possible that the seaman remains alive in the water.[2]

■ But the second branch of the rescue doctrine is the one applicable to Reyes's death. The second branch applies where the seaman falls or jumps overboard but remains visible to those on board the ship. There, a long line of cases has imposed an affirmative Jones Act duty upon the ship to use every reasonable means to retrieve the seaman from the water. *E. g., Harris v. Pennsylvania R.R. Co.,* 4 Cir., 1931, 50 F.2d 866, 1931 AMC 1303; *Cortes v. Baltimore Insular Line, Inc.,* 1932, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368, 1933 AMC 9 (approving of *Harris* in dictum); *Kirincich v. Standard Dredging Co.,* 3 Cir., 1940, 112 F.2d 163, 1940 AMC 868; *Tompkins v. Pilots Assoc.,* E.D.Pa., 1940, 32 F.Supp. 439, 1940 AMC 716; *Schlichter v. Port Arthur Towing Co., supra* at 804–06, 1961 AMC at 1169–71; *Grantham v. Quinn Menhaden Fisheries, Inc.,* 4 Cir., 1965, 344 F.2d 590, 593, 1965 AMC 1481, 1484–85; *Britt v. Marine Transport Lines, Inc.,* S.D.Tex., 1969, 1970 AMC 652, 656.

The affirmative duty to rescue arises as soon as the seaman enters the water, whether by jumping or falling overboard. This is an expansive duty which derives from the seaman's celebrated status as a "ward" of the admiralty: "The contract of employment involves not merely a surrender of the personal liberty of the seaman to a greater extent than is customary, . . . but it imposes upon the employer an exceptional obligation to care for the well-being of the crew." *Harris v. Pennsylvania R.R. Co., supra* at 868, 1931 AMC at 1307. There has been some confusion concerning the scope of the duty to rescue where the sea-

1. It is undisputed that the alcohol content of Reyes's blood at the time of death was approximately 0.185%. Despite this evidence, it is clear that Reyes did not *appear* to be intoxicated. No matter what the appearance, an 0.185% alcohol reading is enough to convict a person of driving while intoxicated in almost every state in the Union. Judicial notice of state intoxication laws in connection with ad-

miralty actions is not uncommon. *E. g., Schlichter v. Port Arthur Towing Co.,* 5 Cir., 1961, 288 F.2d 801, 802–03, 1961 AMC 1164, 1167. Thus it is quite appropriate to conclude that Reyes was legally drunk at the time of death.

2. This branch of the doctrine and the leading cases describing it are dealt with *infra* at [manuscript at 144–145].

man deliberately jumps overboard, however. In such situations, some cases might be read to impose the duty to rescue only as of the time that the seaman begins to drown or to cry for help.

■ The correct view is that the duty to rescue arises from the instant that the seaman goes overboard, however, and the cases which seem to suggest otherwise are in fact based either upon a lack of causation[3] or on the fact that (under the Jones Act's comparative negligence doctrine) the seaman's negligence completely offset that of the shipowner's in failing to rescue the seaman.[4] It would be contrary to the underlying rationale of the rescue doctrine to allow a ship's officers to stand idly by—making no preparations for rescue—until the seaman let out a yell for help. *See Grantham v. Quinn Menhaden Fisheries, Inc.,* supra at 593, 1965 AMC at 1484–85 (rejecting such a "one-yell" rule, and stating that "we decline to interpret the rescue rule so restrictively").

Having clarified the duty element of the rescue doctrine, we proceed to the elements of breach of duty and causation. Breach of duty to rescue is established by the fact that a line-throwing appliance *could have* been used to deliver a line to Reyes. Coast Guard regulations required the ship to have a rocket powered line-throwing appliance capable of throwing at least 1,500 feet of line. 46 CFR § 94.45–1 *et seq.* We are

aware that these line-throwing appliances are not usually used to rescue men in the water.[5] Nevertheless, for purposes of establishing breach of duty, it is only important that the required appliance might have been used to effect a rescue.

■ The failure to follow *any* Coast Guard regulation which is a *cause* of an injury establishes negligence *per se.* In *Kernan v. American Dredging Co.,* 1958, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, 1958 AMC 251, an open-flame kerosene lamp was placed on the deck of a scow, rather than at least eight feet above as required by Coast Guard regulation. The regulation was solely for purposes of navigation, not crew or fire safety. The lamp ignited the surface of the river and a seaman abroad the tug which was towing the scow lost his life. The Supreme Court awarded Jones Act damages and expressly held that the type of Coast Guard regulation violated was irrelevant so long as the violation played any part in causing the injury. *See also Neal v. Saga Shipping Co.,* 5 Cir., 1969, 407 F.2d 481, 1969 AMC 280.

■ Consequently, the lack of the required line-throwing device, coupled with the shipowner's duty to rescue, establishes that the shipowner was negligent as a matter of law. Only a cluster of *causation* problems remain. Our reconsideration of

**3.** *E. g., Nolan v. Greene,* 6 Cir., 1967, 383 F.2d 814 (clear lack of causation); *Kiesel v. American Trading & Producing Corp.,* D.Md., 1972, 347 F.Supp. 673, 679 (seaman was either weak and dizzy as a result of his long-standing alcoholism or deliberately jumped overboard—either way, a search over two hours later would have been futile). In *Britt v. Marine Transport Lines, Inc., supra,* the District Court based its finding of no liability on both a lack of causation and on the seaman having been 100% negligent. There the seaman was apparently sober and disobeyed orders by jumping off the ship.

**4.** *E. g., Rabb v. Canal Barge Co.,* 5 Cir., 1970, 428 F.2d 201 (seaman was 100% negligent for failing to wear required life jacket and not carrying flashlight); *Schlichter v. Port Arthur Towing Co., supra* (decedent was drunk, without knowledge or aid of shipowner, and had himself caused life jackets to be unavailable);

*Britt v. Marine Transport Lines, Inc., supra* (see discussion in *supra* note). *Cf. In re Atlass' Petition,* 7 Cir., 1965, 350 F.2d 592, 1965 AMC 2048 (seaman injured when drunk, but without knowledge or aid of shipowner); *Donovan v. Esso Shipping Co.,* 3 Cir., 1958, 259 F.2d 65, 1958 AMC 2096 (seaman injured but own negligence outweighed employer's).

**5.** It is by no means unheard of for line-throwing appliances to be used to rescue men in the water. Authoritative references imply that line-throwing appliances are usually used to pass lines from ship to shore or from ship to ship, often for purposes of towing, however. *See* G. Danton, The Theory and Practice of Seamanship 129–30 (Routledge & Kegan Paul 1958); American Merchant Seaman's Manual 221 (F. Cornell & A. Hoffman ed., 3d ed. 1942); United States Coast Guard, Ordinance Manual CG–272, at 6–6–12 to 6–6–13 (1978 ed.).

those problems requires a modification of the disposition of this case. We feel that upon remand the District Court must make three categories of findings relating to causation.

The first relates to the deployment of the line-throwing appliance, had one been aboard. From the discussion of the duty element it follows that some member of the crew should have been ordered to break out the line-throwing appliance as soon as it was apparent that Reyes was beyond reach of hand-thrown lines or life rings. From the present record, this would have been at about the same time as an officer was first made aware of Reyes's peril. As discussed, the duty to prepare for rescue does not await the cry for help, nor for other signs that the seaman is about to drown. In addition, the location at which a line-throwing appliance would likely have been stored is a part of this first problem of causation.[6] The District Court on remand must be prepared to determine whether there was time for a crew member to go to the hypothetical storage location, obtain the hypothetical line-throwing appliance, move it to the appropriate firing location, and fire the appliance—all before Reyes went limp in the water.

If the first causation question is resolved in favor of Reyes, then the second and third causation problems arise. The second is whether it was reasonable to use the now-prepared line-throwing appliance. There is *some* possibility that a line or lines fired over or near Reyes might have harmed him or perhaps have impeded his labored swimming. Against this hypothetical, the District Court must somehow balance the possible facts that (i) Reyes was struggling against the current and likely would have cooperated in any rescue efforts, and (ii) Reyes may have responded to a shouted command to grab ahold of the line.

If the first two causation questions are resolved in favor of Reyes, the only remaining question of causation is whether actually firing the line would probably in fact have saved his life. In part the question is whether Reyes went limp in the water between the time that the hypothetical decision to fire a line was reached and the time that such a line would have reached him. Again the question of whether Reyes would have obeyed an order to take the line is also at issue. No doubt there are other minor hypothetical issues which the District Court in its discretion should consider.

From the foregoing discussion, it is apparent that the element of causation in this situation turns on a number of either ambiguous or hypothetical issues of fact. Determining the causation element in this case is made most difficult by the facts that (i) the ship lacked required equipment which could conceivably have been used for rescue and by (ii) the actual failure of the ship to even attempt a rescue. These omissions are solely the fault of the ship.

■ We refuse to place such a difficult burden of proving causation on the widow of the deceased seaman. Instead, the District Court on remand is to presume the existence of causation and defendant-appellee shall have the burden of overcoming that presumption. A number of considerations support this allocation of the burden of proving causation.

The "search and rescue" branch of the rescue doctrine already recognizes such a rebuttable presumption of causation in favor of a seaman's representative. In the leading case of *Gardner v. National Bulk Carriers, Inc.*, 4 Cir., 1962, 310 F.2d 284, 1963 AMC 29, 91 A.L.R. 2d 1023, *cert. denied*, 1963, 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721, the en banc Court pointed out that the ship's omissions had forced the finding of causation to turn on difficult and hypothetical issues. The Court then held, *id.* at 288, 1963 AMC at 35, that "[i]f the

---

**6.** The regulations will be of little help to the District Court in this determination, since the only applicable provision states only that:

The line-throwing appliance and its equipment shall be kept easily and readily accessi-

ble and ready for use. No part of this equipment shall be used for any other purpose. 46 CFR § 94.45–20(a).

rescue doctrine is not to be utterly stultified," a presumption of causation must be accorded to the seaman's representative.[7] *Accord Abbott v. United States Lines*, 4 Cir., 1975, 512 F.2d 118, 1975 AMC 1629. *Cf. Barrios v. Waterman S.S. Corp.*, 5 Cir., 1961, 290 F.2d 310, 1961 AMC 1123 (ship unable to return to search for seaman due to weather).

In *collisions* involving violations of statutes or regulations, the reversal of the burden of proving causation is well-established under the rule of *The Pennsylvania*.[8] *See Skidmore v. Grueninger*, 5 Cir., 1975, 506 F.2d 716, 721 n.1, 1976 AMC 1103, 1110 n.1; *Puerto Rico v. The S.S. Zoe Colocotroni*, D.Puerto Rico, 1978, 456 F.Supp. 1327, 1335, 1979 AMC 21, 29–30. The Second Circuit, dealing with an action for limitation of liability rather than the rescue doctrine as such, has applied the *Pennsylvania* rule to a man-overboard situation. There, violations of statutes governing the stowage of a life raft and the loading of a barge occurred, but there was no evidence that these violations contributed to the deaths of two seamen aboard the barge. The Court nevertheless found in favor of the seamen, by means of a shift in the burden of proof:

> Seaboard argues, however, that there was no evidence that any of the barge's defects or Seaboard's negligent acts probably caused the deaths, and that therefore there is a failure of proof. We need go no further here than to say, however, that given the statutory violations alone (the liferaft stowage and the overloading), Seaboard is not entitled to exoneration. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873), makes it clear that the burden is on a ship in violation of a safety statute—in this case the barge—to show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Seaboard is wrong in its contention that admiralty applies this rule only in collision cases. *Kernan v. American Dredging Co.*, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (fire on a tug caused by open-flame kerosene lamp carried on scow in statutory violation); *The Denali*, 112 F.2d 952 (9th Cir. 1940) (stranding case).

*In re Seaboard Shipping Corp.*, 2 Cir., 1971, 449 F.2d 132, 136, 1971 AMC 2145, 2152, *cert. denied*, 1972, 406 U.S. 949, 92 S.Ct. 2038–39, 32 L.Ed.2d 337. *See* 1B R. Benedict, *supra* § 26, at 3–152 to 3–153 (discussion of case).

Allowing plaintiff Stella Reyes a presumption of causation is also strongly urged by commentators. As Benedict states:

> Whereas in [some] cases there is reason not to place the burden of rebutting a presumption of negligence and causation on the defendant there appears little ex-

---

**7.** Proximate cause, the ship urges, has not been proved. Failure to reverse her course and conduct a search, the argument runs, does not of itself account for the death, since it has not been definitely shown that the man was alive and could have been saved. But this view ignores the underlying character of the duty. It was less than a duty to rescue him, but it was a positive duty to make a sincere attempt at rescue. The duty is of such nature that its omission will contribute to cause the seaman's death. The duty arises when there is a reasonable possibility of rescue. Proximate cause is tested by the same standard, i. e., causation is proved if the master's omission destroys the reasonable possibility of rescue. *Harris v. Pennsylvania R. R.*, 50 F.2d 866, 869 (4th Cir. 1931). Therefore, proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss

as a consequence of its breach. Once the evidence sustains the reasonable possibility of rescue, ample or narrow, according to the circumstances, total disregard of the duty, refusal to make even a try, as was the case here, imposes liability.

Moreover, the master's default—virtually complete—is emphasized by another consequence flowing therefrom. It obliterated all possibility of evidence to prove whether a search, if undertaken, would have succeeded or failed. This alone has in analogous situations been considered a sufficient ground to fasten responsibility on the wrongdoer. *Id.* at 287, 1963 AMC at 33–34 (footnote omitted).

**8.** *The Pennsylvania*, 1874, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148, 151.

cuse for not doing so in rescue-type cases, where, independently of Coast Guard regulations, the shipowner is charged with the highest degree of diligence to save a seaman who has gone overboard.

\* \* \* \* \* \*

. . . [I]t [is] not . . . inappropriate for the trial judge to . . . [invoke] the *Pennsylvania* standards and [place] the burden of proof on the defendant. *It seems unfair . . . to force the decedent's representative to deal with the defendant's contention that despite his negligence there would have been no time in any event to have saved the drowning man.*

1B R. Benedict, § 26, at 3–152 (emphasis supplied) (footnote omitted).

The problem with . . . [requiring the plaintiff to prove causation is] that it leaves open the possibility that even where the seaman is able to tread water for a brief period of time, the shipowner can claim that he did not have sufficient time in which to commence rescue operations. As mentioned above, such situations could be more equitably handled by placing the burden on the defendant to show not merely that his fault might not have been one of the causes of the drowning, or that it probably was not, but that it could not have been a contributory factor.

*Id.* § 30, at 3–236 (footnotes omitted).

■ Nothing that has been said impairs the principle that the causative element in Jones Act cases is less than the common law standard of proximate cause, although cause in fact is still necessary. We reaffirm our previous interpretation of *Spinks v. Chevron Oil Co.,* 5 Cir., 1975, 507 F.2d 216, and *Sanford Bros. Boats, Inc. v. Vidrine,* 5 Cir., 1969, 412 F.2d 958, 1969 AMC 1706: "A ship owner's negligence under the Jones Act need not be the sole proximate cause of an injury to result in liability, but may merely be a contributing cause." 558 F.2d at 244. *See Santana v. United States,* 1 Cir., 1977, 572 F.2d 331, 335–36, 1978 AMC 1725, 1731–32 (reversing trial court's "apparent" application of a proximate cause standard).

Combining this slight standard of causation with the presumption of causation to which the plaintiff is here entitled means that on remand the shipowner must show that the ship's inaction and regulatory violations could not have been even a contributing cause of Reyes's death. *See In re Seaboard Shipping Corp., supra.*

■ If the District Court on remand finds in favor of the plaintiff as to the causation element, then the element of damages and, in particular, the contributory negligence of Reyes must be assessed. The Jones Act of course embodies a "comparative" negligence framework. Thus Reyes's negligence is to be offset against that of the shipowner in order to determine damages. Had Reyes been sober or had he obtained liquor without the aid and knowledge of the shipowner, then we might well hold as a matter of law that his recklessness in jumping off the ship completely offset the negligence of the shipowner. A number of decisions which have held the shipowner not liable where the seaman voluntarily jumps overboard are consistent with such a total offset. *See note 4, supra.*

■ In this case, however, the shipowner was largely responsible for Reyes's reckless act. The fact is that a floating dram shop was operating on board, the use of intoxicants obtained therefrom was not supervised, and as a consequence "the vessel must bear at least part of the fault . .," 558 F.2d at 244, for Reyes's negligence. Thus we reaffirm our previous holding concerning damages. We again, caution, however, that the District Court on remand cannot hold that Reyes was 100% contributorily negligent.

Since we remand for causal determination, the District Court must, as the dissent pointed out, 558 F.2d at 248, also consider causation with respect to our finding either of unseaworthiness or negligence with respect to the operation of a floating dram shop. *See* 558 F.2d at 244–45.

Plaintiff must now return to the District Court to have determined, on this record or

on a record supplemented as the parties and the District Court deem appropriate, these issues of causation and comparative negligence.

No member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, the Petition for Rehearing En Banc is DENIED.

REVERSED and REMANDED.

JAMES C. HILL, Circuit Judge, concurring in part and dissenting in part.

I concur in so much of the opinion on rehearing as remands for a determination of the issue of causal relationship between the defendants' failure to maintain line throwing appliances and Reyes' death. For the reasons stated in my original dissent, 558 F.2d at 248–49, I once again must dissent from the findings of unseaworthiness and negligence as matters of law.